$\begin{array}{c|c} 7 & 225 \\ \hline 48 & 434 \end{array}$

## MATTHEWS, FINLEY & CO. *v.* C. M. RUTHERFORD.

The accommodation party to a note, holds himself out to the public, by his signature, as absolutely bound to every person who shall take the note for value, to the same extent as if that value were personally advanced to himself, or at his request. Nor is it any defence that the party who takes the note, knows it to be accommodation paper, if, before it becomes due, he takes it *bonâ fide* and for value.

An accommodation party to a note, who authorizes the holder to sell, cannot resist payment on the ground that he pledged it.

A notarial act of pledge, or a written act registered in a notary's office, is a formality which is necessary to protect the payee against third parties; but its omission is unimportant as between pledgor and pledgee.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. *Samuel R. Walker*, for plaintiff, cited Chitty on Bills, 334. *Nisbet v. Galbraith*, 3 Ann. 692.

*E. R. Olcott*, for defendant. Where negotiable notes are delivered as security for a debt, and no authentic act is made to evidence the pledge, they will not confer a preference in case of insolvency. 2 L. R. 361 and 386. "It is not every endorsement and deposit of a note as collateral security that transfers such absolute property, as will deprive the payee or depositor of all right, and the maker of every defence he may have against it previous to the notice of deposit or pledge." *Lapice v. Clifton*, 17 L. R. 157.

By the court:

SLIDELL, J. This suit is brought upon a note dated in April, 1851, at eight months, for $1980, made by the defendant, to the order of *S. B. Conrey*, and by him endorsed in blank. The answer contains a general denial, and also pleads that the plaintiffs are not the owners of the note, but merely hold it as collateral security for debts due them by the payee; that *Conrey* gave the defendant no value for it; that no legal transfer was ever made to plaintiffs; that they gave no value for it, &c.

There was judgment for the defendant, and the plaintiffs have appealed.

From the testimony of *Conrey*, a witness offered by the defendant, it appears that the defendant gave *Conrey* this, with other accommodation notes, amounting to between nine and ten thousand dollars. "The arrangement between witness and *Rutherford* was, that he, the witness, could raise money on those accommodation notes. The agreement between witness and *Rutherford* was, that witness should take the notes." In May or June, 1851, *Conrey* applied to the plaintiffs for a loan of $4500, which they made upon his giving them the defendant's notes, as collateral security, for the payment of the money at the time stipulated, which was about twenty days. No act of pledge was made. It does not appear that the plaintiffs knew the notes were accommodation notes; and *Conrey* says he thinks they were not aware of it. He has repaid them $1500, and a balance of $3000 is still due.

In support of the judgment of the court below, the appellee relies on the following cases: *Coddington v. Bay*, 20 Johnson, 637. *Rosa v. Brotherson*, 10 Wendell, 86. *Smith v. Van Loan*, 16 Wendell, 662. *Thompson v. Hule*, 6 Pick. 260.

Every one of those cases will, upon examination, be found to differ from the present in the attendant circumstances, and to involve *arguendo* doctrines, which support, instead of invalidating, the claim of the plaintiffs.

In *Coddington* v. *Bay*, the case was this: *Randolph* and *Savage* were employed by *Bay* to sell a ship for him, on credit, and transmit him the purchaser's notes. Instead of doing so they, becoming insolvent, gave the notes to *Messrs. Coddington*, as security against responsibilities they were already under, as endorsers of notes of *Randolph* and *Savage*, and makers of notes lent to *R.* and *S.* for their accommodation. The rights of *Bay*, the true owner, were considered superior to those of the *Messrs. Coddington*, mainly upon the ground that they gave no new consideration for them, nor parted with any security as an inducement for their being delivered. But the doctrine was distinctly recognized by all the judges, that a holder who has in the usual course of business and in good faith parted with his money, or his property, at the time of receiving the note and upon its credit, is entitled to protection, and the real owner must bear the loss.

In *Rosa* v. *Brotherson* the case was this: *Brotherson* was sued upon a note of $100, at nine months, payable to the order of *McClelland*, and endorsed by him, before maturity, to *Rosa*, with the understanding that he should apply $55 of its amount to pay himself a debt already due to him by *McClelland*, and the balance to pay another creditor of *McC.* But, before the note was given to *Rosa*, an arrangement had been made between *Brotherson* and *McClelland*, by which the note was satisfied, and was to be given up. It was, therefore, fraudulently put into circulation against the express agreement of the parties. It was held, that as the plaintiff had not paid value, nor parted with any thing at the time of the transfer of the note, thus fraudulently put into circulation, he had no equity superior to that of the makers. He loses nothing, said the court, "if the defendant succeeds in his defence. He gave nothing for the note, advanced nothing, nor incurred any responsibility upon its credit." But the court, at the same time, distinctly recognized the doctrine, that where negotiable paper is transferred in the usual course of business, for a valuable consideration and without notice of fraud, the right of the holder must prevail.

The case of *Smith* v. *Van Loan*, establishes nothing which favors the defence in this cause; and contains, on the contrary, dicta which, by implication, are adverse to the defendant.

In *Thompson* v. *Hall*, the plaintiff took the note, which was payable on demand in six months after it was due, and under circumstances which might reasonably excite suspicion that it was affected by equities. The fact that it was taken as collateral security, was not the controlling ground of the nonsuit.

None of these cases cover the one before us. They and others, which the defendants have referred to or which may be found in the reports, at most, go to this extent, that a note, taken as collateral security for a preexisting debt, without any new consideration whatever, will be held subject to equities between the contending parties; a doctrine which, even thus restricted, has not commanded universal concurrence. See 16 Peters, 1, *Swift* v. *Tyson*. But, on he other hand, the reports and commentators abound in authorities to the effect that the *bonâ fide* holder will be protected against such equities, when he has taken the note as security for advances made upon its credit. Such a case falls within the scope of the general principle of commercial law, which protects the *bonâ fide* holders, for a valuable consideration, of negotiable paper; for the term

value has a very large and liberal import. The principle is jealously guarded in MATTHEWS
England and in the United States, from considerations of public policy in fur- RUTHERFORD.
therance of the convenience and security of commercial dealings. And this
policy is consonant with justice. It rests upon the same basis as the doctrine of
courts of equity in other cases, where the purchaser has obtained the legal title
without notice of the equitable right of a third person to the property. The only
difference in the commercial law, between the absolute holder for value, and the
party who takes the note as collateral security for money advanced, so far as the
right of recourse against the maker is concerned, seems to be this: that the
former may recover in full, and the latter, if there be equities, is restricted to the
extent of his advances. In other words, he is considered as a *bonâ fide* pur-
chaser *pro tanto*. See *Stulker* v. *McDonald*, 6 Hill, 95, and cases there cited.

But, if, under such circumstances, the equity of the maker must yield to the
equity of the holder, although the consideration of the note may have failed, or
the maker may have a just setoff against the payee, or the note may have been
paid, &c., is the case of an accommodation maker to be viewed more favor-
ably? Such is the case here, and when the true nature of the contract, in its
origin, is properly appreciated, all pretence of a defence, under the commercial
law, disappears.

The very object of an accommodation note is to enable the payee, by a sale or
other negotiation of it, to obtain a credit with third persons for its amount. The
party, says a learned author, hold himself out to the public, by his signature, as
absolutely bound to every person who shall take the same for value, to the same
extent as if that value were personally advanced to himself or at his request.
Story on Notes, § 194. See also *Smith* v. *Knox*, 3 Est. 46. Chitty, 91.

Hence, it is no defence that the note was known to the holder to be an accom-
modation note, if he takes it for value, *bonâ fide*, before it becomes due. If,
however, an accommodation note had been given for a special object, which was
abandoned, and afterwards, in fraud of the maker to whom it should have been
given up, it is negotiated, and the endorsee knows or has reason to believe such
fraud, his dishonest participation in its commission would bar his recovery; and
this only is the extent of the suggestion in *Smith* v. *Van Loan*.

The defendant has surely subjected himself to the fullest scope of the doctrine
above enunciated by Mr. Justice Story. For his witness, the payee, says
unqualifiedly, "the arrangement between witness and *Rutherford* was, that he,
the witness, could raise money on these accommodation notes." In the face of
this agreement, to say that although *Rutherford* would have been bound if the
payee had sold the notes outright, he is not bound when the payee raises money
by pledging them, is a refinement which we cannot understand; and which is
certainly in direct conflict with authority. He who has the property has a
disposing power. See *Collins* v. *Martin*, 1 Bos. and P. 650. *Bosanquet* v.
*Dudman*, 1 Stark, 1. *Atwood* v. *Crowdie*, 1 Stark, 483. *Brywood* v. *Watson*,
4 Bing. 496, cited Chitty note p. 85. *Williams* v. *Smith*, 2 Hill, 301. *Bacru-
ter* v. *Priest*, 12 Pick. 406. Story on Notes, § 195. Chitty, 85. Byles, 62.

The only other question presented by the defendant is, whether the pledge to
the plaintiffs is unavailing against the defendant, because it was made without
the form prescribed in the 3125th article of the Civil Code.

We are of opinion that a notarial act of pledge, or a written act registered in
a notary's office, is a formality which is necessary to protect the pledgee
against third persons. But its omission is unimportant as between the pledgor
and pledgee, and is not available to the defendant, who stands in the attitude of a

MATTHEWS     person who has voluntarily clothed the pledgor with the ostensible ownership of
    v.
RUTHERFORD.  the thing pledged, and this for the very purpose of enabling him to raise money
upon it.

The purpose of the law in requiring an act of pledge before a notary, describ-
ing the thing pledged, its amount, number, weight, measure, &c., was to pre-
vent frauds upon creditors. The date of the contract was thus made certain,
and a change of valuable goods for others of inferior value prevented. Without
such precautions an unfaithful debtor, on the eve of proceedings which would
put his property in the custody of the law, might collude with others or with-
draw it from their pursuit, or give unjust preferences by instruments ante-dated.
Experience, however, has shown that the expensive and troublesome formality
of a notarial act was a clog upon commerce, the movement of which should be
rapid and free, and our Legislature has lately abrogated it.* But, between the
contracting parties, a notarial act never was necessary. This contract is open to
proof by ordinary evidence. See Pothier, Nantissement, No. 17. Troplong
108, et seq.

It is therefore decreed, that the judgment of the district court be reversed
and that the plaintiffs recover of the defendant the sum of $1980, with interest
from 15th December, 1851, until paid, and costs in both courts, together with
$2 50 costs of protest.