# Case No. 2,496.

## CASEY v. LA SOCIETE DE CREDIT MOBILIER et al.

[2 Woods. 77; [1] 1 Thomp. Nat. Bank Cas. 285; 7 Chi. Leg. News. 313; 21 Int. Rev. Rec. 219.]

Circuit Court, D. Louisiana. Nov. Term, 1874.[2]

NATIONAL BANKS — PLEDGE OF SECURITIES BY — VALIDITY—PREFERENCE TO CREDITOR — RIGHTS OF RECEIVER.

1. The preference of one creditor to another by a national bank, mentioned in section 5242. Rev. St.. is a preference given to the creditor to secure or pay a pre-existing debt.

2. When a national bank (being embarrassed and in need of assistance. receives a loan of money or other valuable material aid, from a person who knows its embarrassed state. on condition that the party making the loan or giving the aid shall be secured therefor, and the security is accordingly given by pledging a part of the assets of the bank, this is not giving him a preference over other creditors. within the meaning of section 5242. Rev. St.

[Cited in Armstrong v. Chemical Nat. Bank, 41 Fed. 239.]

3. The legislature of Louisiana has left it in doubt whether indorsement as well as delivery is essential to the pledge of a negotiable instrument.

4. The receiver of an insolvent national bank holds only the estate and title of the bank in its assets. and he has no greater rights in enforcing their collection than the bank itself would have had.

5. Neither the bank nor its receiver could recover possession of negotiable securities pledged by the bank for advances to it. on the ground that the pledge was ineffectual for want of indorsement of the securities, while at the same time holding on to the assets to secure repayment of which the pledge was given.

6. When a national bank agreed to deposit with a certain commercial firm in pledge a portion of its assets to secure a loan to be made

[1] [Reported by Hon. William B. Woods. Circuit Judge. and here reprinted by permission.]
[2] [Reversed in Casey v. Cavaroc, 96 U. S. 467.]

to itself, and the loan was received by the bank, it was *held*, that there was no legal obstacle to the depositing of the assets according to the contract, arising from the fact that the president of the bank was a member of the firm with which the deposit was to be made.

7. A national bank which makes a contract not authorized by its charter cannot repudiate the contract, and at the same time retain its fruits.

8. When a national bank pledged a portion of its assets to secure a loan to itself, and the notes pledged were changed from time to time as they fell due, and others substituted in their stead, and this was according to the contract between the bank and the pledgee: *Held*, that the pledge of such substituted notes was not void.

[See note at end of case.]

The case as presented by the pleadings and proofs was substantially as follows: On the 12th of July, 1873, the New Orleans National Banking Association, a corporate body organized under the national banking act June 3, 1864 (13 Stat. 99), was engaged in the banking business in the city of New Orleans, and continued to carry on business until the 4th day of October, 1873, when it suspended payment. On the said 12th day of July, 1873, the defendant, "Societé de Credit Mobilier," of Paris, entered into an arrangement with the said banking association through Charles Cavaroc Sr., its president, whereby the "societé" agreed on its part to accept bills of exchange to be drawn by the banking association, payable ninety days after sight, to the amount of one million francs, and the association agreed to place with the societé ten days before the maturity of said bills the amount thereof. The banking association further agreed to deposit securities in the hands of the commercial firm of C. Cavaroc & Son, of which said Charles Cavaroc Sr., was a member, for the purpose of securing the societé against loss from the failure of the association to place the amount required to meet said bills at maturity. The said firm of C. Cavaroc & Son was constituted by the societé its agent to receive and hold said securities. In pursuance of this arrangement, on or about the 12th of July, 1873, bills of exchange were drawn upon the societé by the banking association at ninety days' sight to the amount of one million francs, and the same were sold by the banking association, and the proceeds, amounting to $218,450.34, were appropriated by the banking association—were credited on its books to the societé, and the bills were accepted by the societé. On the day of the date of the drafts, or the day following, a list was made out of notes due the association, amounting to $220,021.43, and the notes named in the list were put in an envelope and handed to C. Cavaroc & Son, by direction of C. Cavaroc Sr., the president of the association, to be held as security for the societé, to protect it from loss by reason of its acceptance of the drafts. It was subsequently stipulated by C. Cavaroc Sr., on behalf of the association, that as soon as any of said

notes matured, they should be replaced by others of like amount. Some time subsequent to the 12th of July, C. Cavaroc Sr., fearing that the notes already set apart would not be sufficient to secure the societé for its acceptance of said bills, caused another list of notes, amounting to about $100,000, to be made out, and the notes to be deposited with C. Cavaroc & Son, as additional security. As notes matured and were paid or renewed, they were replaced by others, in pursuance of the agreement above stated. The evidence showed that on the 12th of July the association was embarrassed, and that long before its suspension, on the 4th of October, it was insolvent. When the banking association suspended payment, C. Cavaroc & Son claimed to hold all of said notes then in their hands, amounting to $325,011.26, to secure the societé for its acceptance of said bills. After the suspension of the bank it was placed by the order of the comptroller of the currency, in the custody of John Cockrem, as receiver. Cockrem having resigned, the present complainant was appointed receiver in his stead. The bill asks the court to adjudge and decree that all of the said notes held by C. Cavaroc & Son belong to and are the property of said banking association, and that the same, and all the proceeds thereof be placed in the hands of complainant as receiver, to be administered and applied to the payment of the claims of the creditors of said association. The bill is based upon the 52d section of the national currency act (Rev. St. § 5242), which declares as follows: "That all transfers of the notes, bonds, bills of exchange and other evidences of debt to any association, or of deposits to its credit, all assignments of mortgages, securities on real estate, or of judgments or decrees in its favor, all deposits of money, bullion, or other valuable thing for its use or for the use of any of its shareholders or creditors, and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by this act, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void."

J. D. Rouse and J. R. Beckwith, for complainant.

Thomas Allen Clarke, Thomas L. Bayne, and Henry Renshaw, Jr., for La Societé de Credit Mobilier of Paris and for Nat. Park Bank of New York.

Edward C. Billings, for Charles Cavaroc & Son and for F. Schuchardt & Sons.

John Finney and H. C. Miller, for various other defendants.

WOODS, Circuit Judge. The claim of the complainant is that the alleged transfer of the notes and assets of the banking association to C. Cavaroc & Son, to secure the societé for its acceptance of the bills of the as-

sociation, was a transfer thereof in contemplation of insolvency, with a view to prevent the application of the assets in the manner prescribed by the national currency act, and with a view to the preference of one creditor to another; that such transfer is therefore null and void, and that said notes are still the property of the association, and applicable to the payment of its debts.

It has been held by this court that to make "transfers, assignments, deposits and payments" void under the 52d section of the currency act, it is only necessary that the insolvency should be in the contemplation of the bank making the transfer, and not that it should be known to or contemplated by the party to whom they are made. Case v. Citizens' Bank [Case No. 2,489]; Peckham v. Burrougns [Id. 10,897].

The evidence in the case satisfies my mind that the banking association, at the time it made the arrangement already recited with the societé, to wit: on the 12th of July, 1873, was in an exceedingly embarrassed condition, if not actually insolvent. Although C. Cavaroc Sr., its president, testifies that he did not at that time think that the bank was insolvent, he had abundant reason to know soon after that date that it was embarrassed and in a critical situation. This is evidenced by his application for assistance to other banks of the city of New Orleans. In my judgment the evidence shows so much clearly, but it does not show more.

But conceding that C. Cavaroc Sr., the president of the bank, at the time he transferred the notes to C. Cavaroc & Son, for the security of the societé, knew that the association was insolvent, will that fact render the transfer made under the circumstances recited void? That alone is not sufficient. One of two alternatives must exist: (1) It must be with a view to prevent the application of the assets in the manner prescribed by the currency act, or (2) with a view to the preference of one creditor to another. Is it the meaning of the section of the currency act on which the bill is based, that after a national bank is in contemplation of insolvency, no person could do business with it except at the risk of having any means he may put under the control of the bank, no matter under what solemn contract for security, confiscated for the use of the general creditors of the bank? If this is the construction to be given to the 52d section of the currency act, then the moment a bank becomes embarrassed, it must give up and suspend payment, for all who come to its assistance must do so without security. In my judgment, the preference of one creditor to another, mentioned in the 52d section, is a preference given to an existing creditor for a pre-existing debt. If a customer or friend of a bank, knowing it to be embarrassed and in need of assistance, proffers it, for instance, a loan of $50,000 in cash, on receiving security for the amount by a transfer of a part of its portfolio, that cannot be fairly construed as giving him a preference over other creditors. Other creditors are not injured by such a transaction, for the securities that such a creditor takes out, he leaves an equivalent in cash. He becomes a creditor solely on condition of receiving security.

The policy of the law is plain. namely: to prevent preference among creditors holding pre-existing debts. It clearly was not the purpose of the act to forbid the bank from giving security to its friends for means to be advanced on the spot or in the future. The general creditors are not injured by such an arrangement; they may be greatly benefited by it.

Take the case in hand. Suppose the association were actually insolvent on the 12th of July. The societé in effect puts one million of francs into the possession of the bank, and takes security for it. Is the general creditor any worse off? The bank had nothing when the securities were transferred. It gets dollar for dollar for what it transfers. Can that be called giving a preference to one creditor over another? As claimed by counsel for defense, it is in effect an exchange of values rather than the giving of a preference to a creditor. It seems to me to be established, beyond all controversy, by the evidence in this case, that the pledge of the notes of the association complained of was not made in contemplation of insolvency, but it was a struggle on the part of the officers of the bank to avoid insolvency; it was not made to give preference of one creditor over another, but it was a plan adopted by the bank to secure means to carry on its business with a view to be able to pay all its creditors. The construction claimed by complainant for the 52d section of the currency act would make the banks a trap in which the means of their friends, furnished on the pledge of securities, would be drawn in and applied to the payment of the general creditors.

In my judgment the construction placed on the 35th section of the bankrupt act is applicable also to the 52d section of the currency act. That section of the bankrupt act declares that any sale or other disposition of property made by a person insolvent, or in contemplation of insolvency, within six months before the filing of a petition in bankruptcy, by or against him, by any person who has reasonable cause to believe him insolvent, such sale being made with a view to prevent the property coming to his assignee in bankruptcy, etc., shall be void. Under this section it has been held that a sale made in good faith, for the honest purpose of discharging a debt, and in the confident expectation that by so doing the person could continue business, will be upheld. Tiffany v. Lucas, 15 Wall. [82 U. S.] 410. So in Cook v. Tullis, 18 Wall. [85 U. S.] 332, it was held that an exchange of values may be made at any time, though one of the parties

to the transaction may be insolvent; that there is nothing in the bankrupt act that prevents an insolvent from dealing with his property, selling or exchanging it for other property, at any time before proceedings in bankruptcy are taken by or against him, provided such dealings be conducted without any purpose to delay or defraud his creditors or give a preference to any one, and does not impair the value of his estate. And in Tiffany v. Boatman's Sav. Inst., 18 Wall. [85 U. S.] 376, it was held that a man really insolvent, but not having yet openly failed, and hoping to overcome his difficulties and to carry on his business, violates no provision of the bankrupt act by pledging his property for money lent, this money being lent at the time when the pledge was made. See, also, Clark v. Iselin, 21 Wall. [88 U. S.] 360. On the strength of these authorities, construing a provision of the bankrupt act similar to the 52d section of the currency act, and upon my own independent judgment of what is the purpose and intent of said section, I am of opinion that the original transfer made by the banking association to the so- cieté of the assets mentioned was not void.

But the complainant insists that the transfer was void, because not made in compliance with the Code of Louisiana. It is claimed that the Code requires that when a negotiable instrument is pledged by a debtor it must not only be delivered to the creditor to whom it is transferred, but must be indorsed (Rev. Civ. Code, art. 3123), and as it was conceded there was no indorsement of the notes in question, the attempted transfer was ineffectual to carry title.

There has been some confusion in the legislation of Louisiana upon this subject, so that it is not by any means clear whether an indorsement as well as delivery of a negotiable instrument is necessary in order to complete an act of pledge. The act approved March 15, 1855, entitled "An act relative to pledges" (see Fuqua's Civ. Code, 421, note), appears to have been a re-enactment of the act of 1852 (see Acts 1852, p. 15). The first section of this act declares that when a debtor wishes to pawn promissory notes, bills of exchange, etc., he shall deliver to the creditors the notes, bills of exchange, etc., so pawned; and such pawn so made, without further formalities, shall be valid as well against third persons as against the pledgers thereof, if made in good faith. There can, it seems to me, be no doubt that the purpose of this section was to make the delivery of a promissory note without indorsement sufficient as an act of pledge. But in a subsequent revision of the statute law of the state, the provision requiring indorsement was allowed to remain; so that we have in the same statute book an article declaring that indorsement as well as delivery is necessary to the pledge of a promissory note, and another article in effect declaring that indorsement is not necessary. In my judgment it is not necessary to determine in this cause whether indorsement is or is not essential. The receiver holds only the estate and title of the bank in its assets. His title is the same as that of an assignee in bankruptcy. It will not be pretended that the bank could recover back the assets which it had pledged and delivered to the agents of the societé because they were not indorsed, and at the same time hold on to the proceeds of the drafts, for the acceptance of which the assets were pledged, unless there was fraud; and there was no fraud in this case.

An assignment in bankruptcy, like any other assignment, by operation of law, passes the rights of the bankrupt precisely in the same plight and condition as he possessed them, subject to all equities. Mitford v. Mitford, 9 Ves. 100; Gibson v. Warden, 14 Wall. [81 U. S.] 248; Campbell v. Slidell, 5 La. Ann. 274; Mitchell v. Winslow [Case No. 9,673]; Ex parte Dalby [Id. 3,540]. There seems to be no reason why the position of receiver of an insolvent bank under the currency act is any better than that of an assignee in bankruptcy. If the receiver holds the same title to the assets of the bank that the bank itself held, he cannot avoid a pledge which the bank could not avoid. He is not a third person, in the sense of the Civil Code. In the case of Matthews v. Rutherford, 7 La. Ann. 225, it was held that a notarial act of pledge, or a written act registered in a notary's office, is a formality which is necessary to protect the payee against third parties, but its omission is unimportant as between pledger and pledgee. I am of opinion, therefore, that the failure to indorse the notes pledged by the bank is a defect of formalities in making the pledge of which neither the bank nor the receiver can take advantage.

It is further claimed by the complainant that C. Cavaroc Sr., the president of the association, could not at the same time act as president and agent of the association and as the agent of the societé. It is true that the same person cannot sell as the agent of one and at the same time buy as the agent of another, and a contract made by one who acts as the agent of both parties may be avoided by either principal. See Story, Ag. § 211, and note. Such a contract, made by a person acting as agent for two principals, involves an absurdity. But in this case the contract was made between the "societé" and the "association," the latter acting through its president. But it seems to me clear that there was no legal obstacle, the contract having been made and being in force, to the turning over by the association, acting through Cavaroc, its president, of the assets in pledge to be held by the commercial firm of C. Cavaroc & Son. In fact, C. Cavaroc & Son were mere depositaries or stakeholders, and all stakeholders are agents for both parties.

It is further claimed by complainant that Cavaroc, the president of the banking association, could only act by authority of the char-

ter or by vote of the directors in making the pledge of the assets of the association, and that no such authority is found in the charter or minutes of the board of directors. The minutes of the board of directors are evidence, however, that they knew what arrangement had been made between their bank and the "société," and they approved it by voting a compliment to C. Cavaroc Jr., by whose agency the arrangement had been made. The books of the bank showed that it had received a million of francs as the result of this arrangement. It is impossible that the directors should have been ignorant of these facts—they never repudiated the contract nor returned to the societé the fruits of it. This is a ratification. The acts of a corporation, evidenced by a vote written or unwritten, are as completely binding upon it, and as full authority to its agents, as the most solemn acts done under the corporate seal, and promises and engagements may as well be implied from its acts and the acts of its agents as if it were an individual. Abb. Dig. Corp. 579, and cases there cited. A corporation which has received the benefit of a loan cannot avoid liability on a mortgage-to-secure its payment by denying the authority of those who contracted the loan on its behalf. [Ottawa Plank Road v. Murray, 15 Ill. 337];[3] Bissell v. Michigan, S. & N. I. R. Co., 22 N. Y. 258; [Pine Grove Tp. v. Talcott, 19 Wall. (86 U. S.) 678];[3] Bank of U. S. v. Dandridge, 12 Wheat. [25 U. S.] 70, 71.

It is claimed, lastly, by the complainant, that the contract between the banking association and the societé was not legitimate banking business and could not be lawfully carried out. We are not cited to any clause in the national currency act forbidding such a contract, and can see no reason why the association might not lawfully make it. But conceding that the currency act, which is the charter of the association, did not authorize such a contract, it does not follow that the association can repudiate the contract and keep its fruits. Corporations have no right to violate their charters, but they have capacity to do so and to be bound by their acts when a repudiation of such acts would result in manifest wrong to innocent parties. Bissell v. Michigan, S. & N. I. R. Co., 22 N. Y. 258. When it is a simple question of capacity to contract arising either on a question of regularity of organization or of powers conferred by the charter, a party who has had the benefit of the contract cannot be permitted in an action founded upon it to question its validity. Steam Nav. Co. v. Weed, 17 Barb. 378. See, also, Despatch Line v. Bellamy Manuf'g Co., 12 N. H. 205; Moss v. Mining Co., 5 Hill, 137. I am of opinion, therefore, that even admitting that the business carried on under the contract between the association and the societé was irregular and not within the

limits of legitimate banking, that having made the contract and enjoyed its fruits, neither the association nor its receiver can demand to keep the money of the societé, which was received by virtue of the contract, and require the societé to deliver up the assets that were transferred to it in consideration of the contract.

Complainant further insists that the notes pledged by the association were changed, from time to time, as they fell due, and others substituted in their stead, and that this renders void the pledge, at least so far as such substituted notes are concerned. The evidence leaves no doubt on my mind that such substitution was made. In fact, it is admitted by defendant. But has the substitution the effect claimed by complainant? The case of Clark v. Iselin, 21 Wall. [88 U. S.] 360, is a pointed authority to sustain the negative of this proposition, and settles this objection to the title of defendant conclusively against complainant.

I have gone over the grounds relied upon by complainant, to avoid the pledge and transfer of the assets of the New Orleans Banking Association to the Societé de Credit Mobilier. I am unable to find that any of the grounds are tenable. In my judgment the pledge of these assets was a good one to secure the societé against loss by the failure of the association to comply with its contract, and the receiver is not entitled to the pledged notes, or their proceeds, until the societé has been made whole. The bill must therefore be dismissed, and the injunction heretofore allowed dissolved.

[NOTE. The plaintiff appealed to the supreme court, which reversed the decree of the circuit court, and remanded the cause, with directions to enter a decree for complainant. The ground of the reversal, as stated by Mr. Justice Bradley, who delivered the opinion, was that the pledgee, the Credit Mobilier, had never had possession of the securities, nor were they ever in the possession of a third person agreed upon by the parties, but that the actual possession and control was in the pledgor, the bank, and that, therefore, the defendant, the Credit Mobilier, had no privilege as to third persons, within the Louisiana law. Casey v. Cavaroc, 96 U. S. 467.]