## CASEY *v.* CAVAROC.

1. Possession is of the essence of a pledge; and, without it, no privilege can exist as against third persons.

2. This doctrine is in accordance with both the common and the civil law, the Code Napoleon (art. 2076), and the Civil Code of Louisiana (art. 3162).

3. The thing pledged may be in the temporary possession of the pledgor as special bailee, without defeating the legal possession of the pledgee; but where it has never been out of the pledgor's actual possession, and has always been subject to his disposal by way of collection, sale, substitution, or exchange, no pledge or privilege exists as against third persons.

4. Though in such a case the pledgee, by a real action against the pledgor or his heirs, may, under the law of Louisiana, recover possession of the thing, he cannot sustain a privilege thereon as against creditors, or against a bank receiver, or an assignee in bankruptcy, who represents them.

5. Equity will not regard a thing as done which has not been done, when it would injure third parties who have sustained detriment and acquired rights by what has been done.

6. Where it was agreed that a bank should deposit bills and notes with its president and his partner, by way of pledge to secure a loan made by a third party, and the president delivers them back to the bank officers for collection, with power to substitute other securities therefor, it is not such a delivery and possession as is necessary to create a privilege by the law of Louisiana.

APPEAL from the Circuit Court of the United States for the District of Louisiana.

The National New Orleans Banking Association, an organization formed under the National Banking Act of 1864, failed and suspended payment on the 4th of October, 1873, and on the 27th of that month was placed in the hands of a receiver, under the fiftieth section of the act. At or about the time of the failure, Charles Cavaroc, the president of the bank, took therefrom certain bills and notes to the amount of $325,011.26, and delivered the same to his firm of C. Cavaroc & Son, who claimed to hold them as agents for the Société de Crédit Mobilier of Paris, by way of pledge to secure said society for certain acceptances of bills drawn by the bank in July previous. The bill in this case was filed by the receiver to recover possession of said securities, alleging that they were delivered by the bank to Cavaroc & Son, in contemplation of the insolvency of the bank, not by way of pledge, but with a view to give a preference to Cavaroc & Son and the Credit Mobilier over other creditors of the bank,

contrary to the provisions of the fifty-second section of the banking act. The defendants, Cavaroc & Son and the Credit Mobilier, by their several answers, deny that the securities were delivered by way of preference in contemplation of the insolvency of the bank, and insist that they were actually pledged to the society by virtue of a distinct agreement, as a consideration and security for the acceptance by it of bills drawn by the bank to the amount of one million francs; which bills were drawn in pursuance of said agreement, and were negotiated by the bank for over $218,000, and were duly accepted by the society upon the faith of the pledged securities. The answers aver that at the time of this transaction the bank was in good credit and standing.

The parties having gone into proofs, the following facts were shown : —

From May, 1873, until the time of its failure the bank was in a weak financial condition, and constantly becoming weaker. The cashier testified that on the 31st of May it had hardly any funds to meet current checks, whilst the amount due to depositors was $680,775. A deposit of $25,000 was opportunely made by a customer on that day; but the president, Cavaroc, was so apprehensive of immediate suspension, that he refused to let it be used, telling the paying teller that if any thing should happen, he did not want the depositor to lose this money. By getting temporary relief from the other banks of the city, and from the New Orleans Insurance Association, and other large loans, it kept its doors open until the 4th of October, though, in connection with most of the other banks of New Orleans, it ceased, from and after the 24th of September, to pay cash, except for very small amounts, paying only in clearing-house certificates, which it obtained by depositing collaterals with the trustees of the clearing-house. Although it held notes and bills receivable amounting to about a million of dollars, a large portion of these were comparatively worthless, being either protested or renewed at maturity, and the makers constantly failing; and all of them, of any value, being pledged, or agreed to be pledged, for its various loans. Although this condition of the bank was not generally known, and presumably unknown to the Credit Mobilier, yet suspicion

of its solvency began to be entertained by many of the business men of New Orleans as early as June or July, and its stock became almost totally unsalable in the market.

In the early part of July, 1873, Charles Cavaroc, Jr., a member of the New Orleans firm of C. Cavaroc & Son, being in Paris on behalf of the New Orleans National Banking Association, entered into negotiation with the Credit Mobilier for procuring the acceptance of the latter for the accommodation of the bank; and, on the 11th and 12th of July, the said negotiation was concluded in the form of a letter addressed by Cavaroc to the society, and of an answer thereto by the latter. The following are the material parts of this correspondence. Cavaroc, in his letter dated July 11, 1873, says: —

"The verbal agreements entered into between us relative to this operation can, we think, be thus resumed: —

"'In order to benefit by the difference in the rates of exchange between the summer months and end of the year, time when the large shipments commence, the Society of the Credit Mobilier authorizes the New Orleans National Banking Association to draw upon it, and binds itself to accept these drafts at ninety days, up to 1,000,000 francs.

"'The drafts made under these conditions shall be renewable under the same conditions, but it is expressly specified that, ten days before maturity, the Society of the Credit Mobilier shall be covered by Mr. Cavaroc, president, to the amount of the payments to be made.

"'The funds realized from these emissions shall be used by the bank against guaranties and securities of the first class, which shall be deposited by the bank with the firm of Messrs. Cavaroc & Son, which shall be the depository thereof, and advise the Credit Mobilier of such deposit.

"'The bank shall guarantee the investment of these sums, and the interest shall be carried to the credit of the joint account, at the rate of seven per cent per annum.

"'This account shall in no manner allow any commission or privileged charge on either side, — there shall figure only brokerage, stamps, and divers charges, really and honestly incurred by either side.

"'The accounts shall be stated at the closing of each operation.

"'Profit and loss shall be equally divided between the Credit Mobilier and the New Orleans National Banking Association.'"

The answer of the society, dated on the 12th of July, 1873, repeats this contract, and accepts its terms.

During the negotiation, on the 11th of July, Cavaroc and the Credit Mobilier, respectively, despatched the following successive telegrams to the bank in New Orleans:—

1. "Bank exchange one million, ninety days' sight, Société de Crédit Mobilier, giving best securities deposited with house.

(Signed)      "CAVAROC."

2. "Defer drawing, the agreement is not yet completed.

(Signed)      "CREDIT MOBILIER."

3. "Draw bank one million, ninety days' sight, Credit Mobilier accepting our guarantee.

(Signed)      "CAVAROC."

In pursuance of these advices, on the 12th of July the bank drew its bills on the Credit Mobilier to the aggregate amount of one million francs, and negotiated them through Schuchardt & Co., of New York, realizing therefrom $218,454.34. The bills were accepted by the society in due course, and were afterwards paid by it, no funds being provided by the bank for that purpose.

The answers allege that in this transaction Cavaroc &. Son acted as the agents of both parties. The answers further allege that the securities in question were delivered by the bank to Cavaroc & Son, for the Credit Mobilier, in pursuance of the agreement; that a portion thereof, to the nominal amount of $220,021.41, a list of which is contained in a schedule annexed to the answer of the society, marked "Exhibit B," were delivered on the day the drafts were drawn, to wit, July 12, 1873; and that these not being deemed sufficient, another deposit, representing about $100,000, was made a few days afterwards; that some portion of these securities coming to maturity and being paid, Cavaroc & Son allowed the bank to receive the cash paid thereon, upon other securities being given equal thereto, in lieu thereof.

It was proved that the securities were delivered, or pretended to be delivered, as stated; but the evidence as to the time and manner of the delivery, and the manner in which

the securities were afterwards treated, presented serious questions for the consideration of the court. It was evident that the identical securities specified in "Exhibit B." could not have been delivered as early as the 12th of July, because they were dated and discounted after that day, and "Exhibit B" itself was not made out until the nineteenth day of August. There was some evidence that securities to the amount of this schedule had been delivered to Cavaroc & Son at or soon after the twelfth day of July, and that those named in the exhibit had been substituted for them as they severally became due, and were renewed, or paid, as stated in the answer. The other securities, amounting to about $100,000, could not have been added until after Aug. 19, when "Exhibit B" was made out, or they would have been included therein. This list, contained in "Exhibit B," was made out for the purpose of being transmitted to the Credit Mobilier. A letter from C. Cavaroc & Son to the society, bearing date Aug. 19, 1873, was exhibited in evidence, with which, as Cavaroc, Sen., testified, a copy of the list "Exhibit B" was forwarded to the society. It contained the following passage:—

"If we have not sent you, at first, the memorandum of the valuables we have received from the bank, to guarantee our house and yourselves, it is because the subsequent despatch of our son gave us to understand that the operation was made under our guaranty; and we had ourselves taken these valuables. But we think it more just that we should not only transfer you this deposit, but that we should give you the details of these notes, which are all of the first class.

"As soon as certain of them will mature, we will take care to replace them by others, and will advise you."

A letter from the society to the bank, dated Sept. 5, acknowledges the receipt of this letter of Cavaroc & Son, in the following terms:—

"By their letter of the 19th of the same month, Messrs. Cavaroc & Son, of your city, have sent us the memoranda of the valuables which you deposited with them to secure your drafts on us. Said valuables amount together to $220,021.41, which is well."

Precisely when the additional $100,000 of securities were added to the first lot does not appear; but Charles Cavaroc, the president of the bank, testified that it was a few days after the delivery of the latter.

But a more serious question related to the manner in which the securities were delivered and disposed of. The evidence on this point was to the following effect: Charles Cavaroc, Sen., the president of the bank, acting as agent of both parties, directed the discount clerk of the bank, who had charge of its portfolio of notes and bills discounted, to select the securities for the Credit Mobilier. They were selected accordingly to the amount of $220,021.41, and placed in an envelope by themselves, and handed to Mr. Cavaroc, for Cavaroc & Son He handed them to the cashier of the bank for safe-keeping. But, as some of the securities soon matured, they had to be taken out of the envelope for collection; and Cavaroc had them collected, or renewed, in the usual manner by the discount clerk. The trouble of going to the cashier whenever a note became due, to get it out of the envelope, after a few days induced a change, and the securities were handed back to the discount clerk, in the envelope, in order that he might more conveniently attend to their collection and renewal. When any of them were paid, the money was taken and used by the bank, and other notes were substituted in their place. When renewed, the new note took the place of the old. On one occasion, quite a large amount of the notes was exchanged for others, because more available in some other transaction of the bank. The entire lot, however, subject to this exchange of individual securities, appears to have been kept in the envelope by itself. In this manner the notes were kept in the bank until its failure on the 4th of October, when Mr. Cavaroc took possession of the package, and thereafter it was kept in the office of his firm. At the same time, the indorsement of the bank was placed on the several securities, which had not been done before. Lists of the securities contained in the envelope had been made out from time to time, — the last being made on he 4th of October, when they were finally removed from the bank. A copy of this list is annexed to the Credit Mobilier's answer as "Exhibit C."

No entry was made on the books of the bank of this transac-
tion with the Credit Mobilier, except that the bills drawn on
it were duly entered amongst bills payable; and the Credit
Mobilier was credited with the amount, which was put down
amongst the liabilities of the bank, and so appeared in all the
monthly statements, beginning with the 1st of August. The
pledge of securities was not noticed. These all remained on
the portfolio of bills discounted, as before, and their amount
continued to be represented in the daily and monthly state-
ments, without any note or memorandum to show that they
had been pledged. So far as the public, and those with whom
the bank dealt, could perceive, the bank continued to have
possession and control of all the securities in its own right, and
they all appeared to be equally liable with the other assets to
the claims of all the creditors.

The Circuit Court rendered a decree dismissing the bill of
complaint, and from that decree the receiver appealed.

*Mr. Thomas Allen Clarke* in support of the decree.

1. The pledge is valid, and, being of negotiable paper, no
other formality than delivery is required. Act of La., 1852,
p. 15, sect. 1; re-enacted 1855, p. 348; Rev. Civil Code, 3158;
Rev. Stat., sect. 2905. The effect of revisory legislation is
stated with clearness in *State* v. *Holmes*, 11 La. Ann. 439,
*State* v. *Brewer*, 22 id. 273, and *State* v. *McCort*, 23 id. 326.

From these decisions, it follows that the provisions of the
Revised Statutes of 1870 retained in force sect. 2905, in refer-
ence to the limitation of formalities in pledges of negotiable
instruments, notwithstanding the Revised Code of the same
year contained the provisions of the old code alongside of the
amendment of 1852. One article of the Code requires cer-
tain formalities, 3160; the other article, 3158, dispenses with
them, and the Revised Code contains the dispensing article.
So neither an act before a notary, nor an indorsement by the
pledgor, is required to constitute a valid pledge.

2. Informalities in a pledge cannot enable the pledgor to im-
peach it, *Partee, Syndic,* v. *Corning,* 9 La. Ann. 539; *Brother*
v. *Saul,* 11 id. 225; although they may be required as against
third persons, *Matthews* v. *Rutherford,* 7 id. 225.

3. The syndic, receiver, or assignee of a debtor has no

greater authority than the debtor, except as the statute provides. *Partee, Syndic,* v. *Corning,* 9 La. Ann. 539; *Gibson* v. *Warden,* 14 Wall. 244; *Cook* v. *Tullis,* 18 id. 332; *Mitford* v. *Mitford,* 9 Ves. Jr. 86.

Assignees in bankruptcy are subject to the same equities affecting the bankrupt's rights which could have been enforced against him. *Grant* v. *Mills,* 2 Ves. & Bea. 308; *Ex parte Hanson,* 12 Ves. 349; *Turner* v. *Harvey,* Jacob, 174; *Campbell* v. *Slidell,* 5 La. Ann. 274; *Gibson* v. *Warden,* 14 Wall. 244; *Yeatman* v. *Savings Institution,* 95 U. S. 764.

4. It is lawful to constitute the pledgor an agent to collect the negotiable instruments pledged, and to replace those collected by others, or to change the securities. *Clark, Assignee,* v. *Iselin,* 21 Wall. 360; *White* v. *Platt,* 5 Den. (N. Y.) 269.

5. Sect. 52 of the statutes of 1864 measures the power of setting aside transfers, &c., at the instance of a receiver. This case has none of the elements prescribed. The interdiction of that section has the same purpose as that of sect. 35 of the Bankrupt Act, and operates on sales or pledges or transfers for a fraudulent object, not on those with an honest purpose.

Two things must concur to bring the transaction within the inhibitions of the law: the fraudulent design of the bankrupt, and the knowledge of it upon the part of the transferee. *Tiffany* v. *Lucas,* 15 Wall. 410; *Wager* v. *Hall,* 16 id. 584; *Wilson* v. *City Bank,* 17 id. 473; *Cook* v. *Tullis,* 18 id. 332; *Mays* v. *Fritton,* 20 id. 414.

Advances may be made in good faith to a debtor to carry on his business, no matter what his condition may be, and the party making these advances can lawfully take securities at the time for their repayment. *Tiffany* v. *Boatman's Institution,* 18 Wall. 376; *Mays* v. *Fritton,* 20 id. 414; *Clark* v. *Iselin,* 21 id. 360; *Watson* v. *Taylor,* id. 378; *Burnhisel* v. *Firman,* 22 id. 170; *Sawyer* v. *Turpin, &c.,* 91 U. S. 114; *Jerome* v. *McCarter,* 94 id. 734.

6. The fact that the senior member of the firm of Cavaroc & Son was president of the bank is immaterial, for he acted as stakeholder in his individual capacity. The contract was between the Credit Mobilier and the bank. In holding the

pledge, the Cavarocs, like all stakeholders, were agents of both parties. There was no inconsistency in this position arising from the fact that one of the partners was president of the bank. He did not stand as contracting on both sides. He said to the bank and to the Credit Mobilier, distinct persons from himself, I will hold these stakes. He made the contract not with himself, but with two other parties.

7. The contract was made with the authority of the corporation, through its board of directors; and the institution, having received the benefit of the loan, cannot avoid its liability by denying the authority of those who contracted in its behalf. *Ottawa Plank Road* v. *Murry*, 19 Ill. 336; *Bissell* v. *Michigan Southern & Northern Indiana Railroad Co.*, 22 N. Y. 258; *Township of Pine Grove* v. *Talcott*, 19 Wall. 666; *Bank of the United States* v. *Dandridge*, 12 Wheat. 64; *Bezou* v. *Pike*, 23 La. Ann. 788.

8. The contract was within the ordinary action of banks and bankers, and not in contravention of the policy or the provisions of the banking act.

*Mr. J. D. Rouse* and *Mr. Charles Case*, contra.

MR. JUSTICE BRADLEY, after stating the case, delivered the opinion of the court.

The substance of the agreement in this case, so far as necessary to be considered, was, that the Credit Mobilier should accept the drafts of the banking association to the amount of a million of francs at ninety days, the bank agreeing to furnish funds to pay the drafts at maturity, with the privilege of a renewal; and it was stipulated that this obligation of the bank should be guaranteed by Cavaroc & Co., and by a deposit with them, for the use of the Credit Mobilier, of first-class securities of which deposit the latter was to be advised.

This arrangement was immediately telegraphed to New Orleans, and the drafts were drawn on the 12th of July; but the weight of the evidence is, that none of the collateral securities were delivered until the 19th of August, — which might raise a question whether the accommodation acceptances of the Credit Mobilier could be considered as a contemporary consideration therefor; or, if not, whether the bank was at that time,

in the apprehension of Cavaroc (the common agent), in a condition of solvency and good credit, — as to which an affirmative answer could not well be given, since the proof is quite clear that the bank was then struggling with serious financial difficulties, from which it never recovered.

Waiving this question, however, for the present, we will proceed to examine whether, supposing that no objection arises from the time when this transaction took place, it amounted to such a transfer or pledge of the securities in question as to entitle the Credit Mobilier to a preference upon them over the other creditors of the bank at the time of its failure. Was there such a delivery and retention of possession of the collateral securities as to constitute a valid pledge by the law of Louisiana? Clearly they were never out of the possession of the officers of the bank, and were never out of the bank for a single moment, but were always subject to its disposal in any manner whatever, whether by collection, renewal, substitution, or exchange; and collections, when made, were made for the benefit of the bank, and not that of the Credit Mobilier.

The case has some features in common with, though differing in others from, that of *Clarke* v. *Iselin* (21 Wall. 360), in which this court held that collateral securities transferred by the borrower to the lender at the time of the loan were not divested out of the latter by the mere fact of his depositing them with the borrower for collection. The court say : " Obviously this deposit in no degree affected the title of the defendants to the notes. It merely facilitated collections." The court then cited *White* v. *Platt*, a New York case in 5 Denio, 269, in which it was said : " Where promissory notes are pledged by a debtor to secure a debt, the pledgee acquires a special property in them. That property is not lost by their being redelivered to the pledgor to enable him to collect them, the principal debt being still unpaid. Money which he may collect upon them is the specific property of the creditor. It is deemed collected by the debtor in a fiduciary capacity."

The case of *Clarke* v. *Iselin*, being a New York case, and governed by New York law, or the common law as understood in New York, the authority cited was necessarily of great

weight, if not controlling. When, as in that case, the title has been transferred to the creditor, and the collections are made for his benefit, the pledgor merely acting as his servant or agent in making them, the character of the security is not affected at the common law by the debtor having actual possession of the collaterals, there being no fraud in the transaction. In such case, they are held by the creditor by way of mortgage as well as pledge; and a mortgage is valid notwithstanding the mortgagor has the possession. The difference ordinarily recognized between a mortgage and a pledge is, that title is transferred by the former, and possession by the latter. Indeed, possession may be considered as of the very essence of a pledge (Pothier, Nantissement, 8); and if possession be once given up, the pledge, as such, is extinguished. The possession need not be actual: it may be constructive as where the key of a warehouse containing the goods pledged is delivered, or a bill of lading is assigned. In such case, the act done will be considered as a token, standing for actual delivery of the goods. It puts the property under the power and control of the creditor. In some cases, such constructive delivery cannot be effected without doing what amounts to a transfer of the property also. The assignment of a bill of lading is of that kind. Such an assignment is necessary, where a pledge is proposed, in order to give the constructive possession required to constitute a pledge; and yet it formally transfers the title also. In such a case, there is a union of two distinct forms of security, — that of mortgage and that of pledge; mortgage by virtue of the title, and pledge by virtue of the possession.

This advantage exists when notes and bills are transferred to a creditor by way of collateral security. His possession of them gives them the character of a pledge. Their indorsement if payable to order, or their delivery if payable to bearer, gives him the title also, which is something more than a pledge. This double title existed in *White* v. *Platt* and in *Clarke* v. *Iselin.* Hence the actual possession of the securities by the creditor was a matter of less importance in those cases.

Whether constructive possession in the creditor can be affirmed, where an article to which his only title is that of pledge is actually re-delivered to the debtor, with general

authority to dispose of it and substitute another article of
equal value in its place, is the question which we have to meet
in this case. Such a redelivery for a mere temporary purpose,
as for shoeing a horse which has been pledged and is owned by
the farrier, or for repairing a carriage which has been pledged
and is owned by the carriage-maker, does not amount to an
interruption of the pledgee's possession. The owner is but a
mere special bailee for the creditor. So, when the debtor is
employed in the creditor's service, his temporary use of the
pledged article in the creditor's business does not effect a res-
toration of the possession to the debtor. This is in accordance
both with the common and the civil law. *Reeves* v. *Capper*
(5 Bing. N. C. 136) was a case of this kind. A sea-captain
pledged his chronometer for a debt. He was afterwards em-
ployed by the pledgee as master of one of his ships, and the
chronometer was placed in his charge, to be used on the voyage.
It was held that the possession of the pledgee was not lost. He
recovered the chronometer against a person to whom the master
pledged it a second time.

In *Hays* v. *Riddle* (1 Sandf. (N. Y.) 248), the plaintiff deliv-
ered to the defendant, at his request, a convertible bond of the
New York and Erie Railroad Company (which had been pledged
by the latter to the former), in order to get it exchanged for
stock of the same company, which stock was to be returned
and substituted for the bond in pledge. The defendant never
returned either the bond or the stock. The plaintiff brought
an action of trover against him for the bond, and recovered its
value, being less than the deb for which it was pledged. It
being objected that by delivering back the bond to the pledgor
the plaintiff had lost his special property in it as pledgee, the
court said: "At common law, as a general rule, the positive
delivery back of the possession of the thing, with the consent of
the pledgee, terminates his title. 2 Pick. 607 ; 15 Mass. 389.
If the thing, however, is delivered back to the owner for a
temporary purpose only, and it is agreed to be redelivered by
him, the pledgee may recover it against the owner, if he refuse
to restore it to the pledgee, after the purpose is fulfilled.
2 Taunt. 266 ; Story on Bailm., sect. 299. So, if it be deliv-
ered back to the owner in a new character; as, for example, as

a special bailee or agent. In such case, the pledgee will still be entitled to the pledge, not only as against the owner, but also as against third persons.   14 Pick. 497."

In *Macomber* v. *Parker* (14 Pick. (Mass.) 497), referred to in the last case, the proprietors of a brickyard contracted it out on shares to a brickmaker, agreeing to advance the money requisite to carry on the manufacture of bricks, and, after being repaid their advances, to divide the profits with the latter. It was agreed that the bricks, as fast as made, should be pledged to the owners of the yard as security for their advances; but the brickmaker was to keep them in his charge, and sell them at retail, and as often as he got the amount of a hundred dollars from the sales he was to deposit it in bank to the credit of the owners. The bricks were afterwards attached as to the share of the maker for his debts. But the court held that the owners of the yard had not, by leaving the bricks in the hands of the maker, lost their lien as pledgees of the entire property. They remark : " To say that this limited authority to sell the bricks by retail, in small sums, on account of the plaintiffs, was a waiver of their possession of the residue that remained in the kilns in their yard, would be clearly against the intent and meaning of the parties, unreasonable, and unwarranted by the evidence." Again : " The special authority given by the plaintiffs to Evans [the brickmaker] was to clothe him with the character of agent to a limited extent only, and no remission to him, in his character of pledgor, of the plaintiffs' right to retain the bricks according to the agreement." To the objection that retention of possession by the pledgor would have the effect to deceive those dealing with him, the court said : " If the vendor or the pledgor should have the actual possession of the property after it were pledged or sold, it would only be *prima facie*, but not conclusive, evidence of fraud. The matter might be explained and proved to be for the vendee or pledgee. It is a most familiar principle, that one man may have the actual possession or custody, while another has the legal title and the constructive possession."

In this case, it will be observed, the pledgees were joint owners of the brick, and were owners of the premises on which the bricks were kept; and the decision was undoubtedly cor-

rect    But, in the general remarks made by the court, there is manifest, as in many other cases, a tendency to confound the distinction between cases in which the title is in the creditor, and those in which his whole interest depends on possession. All the cases cited, however, show that a bailment to the pledgor for a mere temporary purpose for the use of the pledgee, or for the repair and conservation of the pledge, will not destroy the latter's possession; at the same time, they imply that a redelivery to the pledgor, except for the special and temporary purposes indicated, divests the possession of the pledgee, and destroys the pledge.

The civil law, which is more particularly our guide in the present case, is to the same general effect; though it is more careful in denouncing the danger of losing the right of pledge by parting with any thing like permanent or continued possession to the pledgor; and it preserves very clearly the distinction between pledge and hypothecation, or mortgage.  The old civil law of the Digest, it is true, was more indulgent, and permitted the pledge to be delivered to the pledgor without prejudice to the security, in a manner that would not be allowed at the present day.   Thus, in book xiii. of the Digest, title vii., law 35, Modestinus says: " A pledge transfers only the possession to the creditor, the property remaining in the debtor; yet the debtor may have the use of it, either as a gratuity, or for hire."   And Paulus, in the same title, law 37, says: " If I lend a pledge to the owner thereof, I retain possession by means of the loan; for before the debtor borrowed it, the possession was not in him; and when he borrowed it, it was my intention still to retain the possession, and it was not his to acquire it." Pothier's Pandects, vol. vii. p. 360.

As to this law of the Digest, Mr. Bell, in his Commentaries on the Scotch Law, remarks as follows: " Voet very justly observes, in criticising this law, that to permit such practices were to endanger the safety of other creditors, and to sanction a fraud upon the rule which requires possession to complete a real right to movables; and that no true analogy can hold between the law of Rome, where hypothecs without possession were admitted, and the laws of modern commercial nations, in which the rule is established that possession preserves property.

It is true," Bell continues, " that, in the course of many contracts, there is a necessity for separating property and possession ; and that the mere circumstance of goods being in the hands of another on a temporary contract will not deprive the real proprietor of his right, in favor of the creditors of the temporary possessor. And there seems to be no doubt that the right of a pledgee will also be sufficiently strong to support this temporary dereliction of possession, in the course of necessary operations on it ; the manufacturer, or other holder, being custodier for the pledgee, without injury to the real security. But the doctrine delivered by Voet is sound, where the possession is given up without necessity to the owner of the goods." 2 Bell, Com. (7th ed.), p. 22.

The modern French law, governed by a similar policy, has been put into a very explicit form in the Civil Code, which has been followed in the Civil Code of Louisiana. A quotation of some of the principal articles, bearing on this subject, will show the care taken to require distinct possession in the pledgee.

Art. 3158 (Rev. Civ. Code La.), relating to movables, is as follows: " This privilege " [namely, that of pledge] " shall take place against third persons, only in case the pawn is proved by an act made either in a public form, or under private signature : *Provided*, that in this last case it should be duly registered in the office of a notary-public at a time not suspicious : *Provided also*, that, whatever may be the form of the act, it mentions the amount of the debt as well as the species and nature of the thing given in pledge, or has a statement annexed thereto of its number, weight, and measure." This article is copied from art. 2074 of the Code Napoleon.

As to negotiable securities, the Louisiana Code, by art. 3161, provided that a regular transfer by indorsement should be sufficient. But by a subsequent act, passed in 1852, and re-enacted March 15, 1855, it was provided " that where a debtor wishes to pawn promissory notes, bills of exchange, stocks, obligations, or claims upon other persons, he shall deliver to the creditors the notes, bills of exchange, certificates of stock, or other evidences of the claims or rights so pawned ; and such pawn so made, without further formalities, shall be valid as well against third persons as against the pledgors thereof, if made in good

faith." A question was made on the argument whether this statute was in force in 1873, when the transaction in question took place. Without giving our reasons at present, it is sufficient to say that we are satisfied that the act was in force at that time.

The next article, 3162, which is not affected by the statute, and which is copied from art. 2076 of the Code Napoleon, is important, and is in these words: "In no case does this privilege subsist in the pledge except when the thing pledged, if it be a corporeal movable, or the evidence of the debt, if it be a note or other obligation under private signature, has been actually put and remained in the possession of the creditor, or of a third person agreed on by the parties."

As might be supposed, this article has formed the subject of much discussion by the commentators. Troplong says: "The pledgee has this privilege only on the condition of being possessed of the thing. This condition was expressly imposed upon him by art. 181 of the Custom of Paris. This is reproduced by art. 2102, No. 2, of the Code Civil, and we shall specially discuss it in the commentary on art. 2076. Possession is indispensable to him. It withdraws the thing from the hands of the debtor and from the actions of creditors, and sets it aside in a privileged situation. '*Possidentis melior est conditio.*' Possession is the most sure foundation, and the most striking index of his privilege. Without it, the creditor would have no ground for escaping the law of contribution. Casaregis says, 'Preference is accorded to a pledgee on the thing pledged, because he has it in his own hands.'

"This possession ought to be certain and not equivocal. If it is ambiguous, if the things pledged have been so placed as to deceive the other creditors, and to lead them to believe that the debtor always continued the possessor, the pledge would be endangered."

Troplong shows, however, that this possession may be a civil possession, as where the delivery is made by the transfer of a bill of lading of goods on board a ship, &c. Troplong, Nantissement, arts. 97–99.

The same author, in commenting on art. 2076, after treating of the absolute necessity of possession by the pledgee, in order

to constitute the relation of pledge, and after discussing the different forms of possession, actual and constructive, adapted to the nature and situation of the thing pledged, proceeds (Nantissement, No. 309) to treat of the manner in which it may be in the hands of the pledgor without destroying the possession and right of the pledgee. He says: " Though the merchandise be deposited in the creditor's storehouse, it may still need the care of the debtor. Then it is not forbidden to stipulate that he shall continue to attend to it in the interest of the creditor. The important thing is, that this clause does not cover a fraud. Aside from this, the possession of the creditor is not incompatible with a certain co-operation of the debtor, — being for the conservation of the thing; — he still being the owner. The creditor does not any the less continue exclusive possessor of the thing. The debtor is none the less dispossessed of it." He then gives some cases by way of illustration. For example: —

In 1839, Morin & Co., of Beaune, pledged to Weiland & Co., of Baden, sixty thousand bottles of sparkling Burgundy, for a debt. The wine was delivered to an agent of Weiland & Co., and deposited in a vault hired by him for the purpose. It was agreed that Morin & Co. should give the wine all necessary care, in presence of the agent, who was to keep the keys of the vault. But, to facilitate matters, it sometimes happened that the agent gave the keys to Morin & Co.; and once, in 1840, the latter removed some of the bottles of wine to their own premises. Morin & Co. having failed, their assignees (syndics) insisted that the pledge was null and void, because the debtors were not dispossessed of the wine. But Weiland & Co. having renounced their privilege on the wines which had been removed, were sustained by the highest court in their claim to the remainder. It was held that the special character of the wine, and the difficulty of finding persons qualified to take proper care of it, were sufficient reasons for employing Morin & Co. to attend to it; and the agent's allowing them to take the keys occasionally for this purpose was a mere matter of convenience, to facilitate the operations of the workmen. Troplong, Nant., No. 311; Dalloz, Repertoire, vol. xxxii. p. 455, art. Nantissement. See also Duranton, vol. xviii. Nos. 525, 528, 531.

A different result was had in another case, where certain Champagne wines were the object of the pledge, and the debtor had reserved the care of them; and, though the vaults in which they were stored were leased to the creditors, they communicated by open doors with the other vaults of the debtors, where their workmen were employed on the wines, and there was nothing to indicate which were pledged, and which were not, and nothing to prevent a substitution thereof; so that the debtors appeared in possession, and kept up their credit thereby, which they could not otherwise have done. Troplong, No. 312; *Ricou et al.* v. *Syndics of Joly. & Co.*, Dalloz, Repertoire, Nantissement, No. 93, note.

In another case, it was decided that the debtor might be permitted to make sales of the goods pledged, provided that they remained in the pledgee's possession, and could not be delivered to the purchaser without his consent. Dalloz, No. 129.

Troplong deduces, from these and other cases, the general conclusion that, whenever the assistance of the debtor is necessary to the better accomplishment of the object of the pledge, it ought to be permitted, provided always that it does not disturb the possession of the creditor in any respect. Nant., No. 313. Dalloz says: " It is evident that if the pledge of movables could, without a delivery, have effect in regard to third persons, it would be the source of great frauds and deceptions. When the debtor is obliged to surrender possession he cannot deceive third parties dealing with him by keeping possession of the pledged articles as part of his estate, and getting credit thereby." He takes special notice of the decision that a pledge is not valid if the dispossession of the debtor is not sufficiently complete to prevent substitution; or if there is a mere contract for a pledge, and not an actual pledge. Dalloz, Rep, Nant. 119. And he lays down the principle, that though à contract for a pledge may be enforced against the pledgor and his heirs (Nant., No. 121), yet that, by the very words of the Code, he cannot set up the privilege of the pledge, which alone constitutes his right as against third persons, without actual possession, or its equivalent. Nant. 119, 209.

From these authorities it seems to be evident that, in the French law at least, the text of which, in this regard, is the

same as that of Louisiana, a delivery by the owner of securities by way of pledge, followed by a return thereof to him, for the purpose of enabling him to collect them and apply the money to his own use, on substituting others in their stead, and with general liberty of substitution, and to appear as the owner and possessor thereof in his dealings with others (the title of the securities not being transferred to the creditor), is not such a delivery of possession as is necessary to establish the privilege due to a pledge as to third persons. It would be contrary to the very letter of the law to allow such a transaction to have that effect. It would not be mere evidence of fraud, which might be rebutted by counter evidence; but it would be contrary to the rule of law adopted to prevent fraud. In other words, as to third persons, it would not be a pledge at all within the meaning and requirements of the law.

We think that the decisions in Louisiana lead to the same conclusion. In the case of *Geddes* v. *Bennett* (6 La. Ann. 516), the object of the pledge was certain barrels of whiskey in the warehouse of a third person. The creditor allowed the debtor to remove them to his own premises, upon giving the following receipt: "Received from J. & R. Geddes four hundred and fifty-six barrels of whiskey, on storage." Having the goods thus in his own possession, the debtor parted with them to a third person. The Supreme Court, in an action brought by the pledgees to recover the whiskey, said: "The plaintiffs have shown no compliance with the articles of the Code, concerning the form of the contract of pledge, which it would be necessary to observe in order to enable them to recover against the defendants, who are third persons; and our impression is, that, under the circumstances of the case, the delivery of the object pledged to Bennett, even under the receipt he gave, would of itself defeat the pledge;" referring to article 3162 of the Code, which we have been considering. And in the late case of *D'Meza's Succession* (26 id. 35), Myers & Levy had made certain accommodation indorsements for the deceased, upon the faith and promise of receiving from him a policy of insurance upon his life, for which he had made application. Having procured the policy, he told them to call at his office and get it from his book-keeper, informing them that he had told the book-keeper

it was for them. But he died before it was actually delivered. The court held that the policy was never placed beyond the control of D'Meza, and that Myers & Levy never had the requisite possession thereof. "The book-keeper," say the court, "never held the policy as agent or trustee for Myers & Levy. Although informed of his employer's intention in regard to one of the policies" (he had obtained two of the same amount), "he was never instructed to deliver it to Myers & Levy, or any one else. There was, therefore, no delivery of the policy to Myers & Levy, although the deceased intended to do so. Consequently, they never held it as a pledge or collateral security for their accommodation indorsements." These cases appear to us to govern the present. The securities claimed to have been pledged to the Credit Mobilier remained in the possession and control of the bank until the time of its failure. Up to that period they were not in such a condition as the law requires for a pledge. The placing them in such a condition afterwards, by Cavaroc's removing them from the bank at the time of its failure, was, in fact, an attempt to create a pledge then, by assuming the possession requisite thereto; and a pledge taking its origin at that time was a preference forbidden by the banking act.

It must not be overlooked that the Credit Mobilier has no other claim to the securities in question but that of pledge. A pledge, and possession, which is its essential ingredient, must be made out, or their privilege fails. An agreement for a pledge raises no privilege. There is no mortgage; for the title of the securities was never transferred to them. The evidence of the cashier is, that they were all stamped payable to the order of the bank, when discounted. They were not indorsed by the cashier until the day they were removed by Cavaroc, which was after the bank had failed.

Two cases, decided by the Supreme Court of Louisiana, have been cited and relied on (as well as some other cases in England and the United States), to show that an assignee only takes the property assigned exactly in the plight in which the debtor held it, and subject to all the equities to which it was subject in his hands. The first case is that of *Campbell* v. *Slidell* (5 La. Ann. 274), in which a syndic claimed certain real

estate which the debtor had conveyed to a *bona fide* purchaser, but the deed had not been duly registered. The court held that this made no difference. The debtor had parted with the title, and, therefore, he could not assign to the syndic what he did not himself own, although the deed might be void, for want of registry, as against a subsequent purchaser in good faith, or a subsequent judgment creditor who should acquire a mortgage by recording his judgment. It is evident that this case is unlike the one now under consideration. Here the debtor never transferred the title; and the only question is, whether there was such an attempt to pledge as to raise a privilege, — which, as we have seen, there was not.

The second case is that of *Partee, Syndic,* v. *Corning,* 9 La. Ann. 539. In this case, the debtor had actually pledged and delivered bills receivable to the defendants for simultaneous advances, but had not indorsed the bills, as required by art. 3156. The court said: "It is clear that the pledgors could not have set up this objection; and we are of opinion that the syndic cannot, upon a mere naked informality of this sort, disturb the pledge. Let it be observed that there is no pretence that the pledges were taken in bad faith, or that an injury was done to creditors in taking them." Here, the indispensable requisite of possession existed. The other formalities (which were required at that time) were enjoined by the article referred to, it is true; but there was no declaration that the pledge should be void, or that the privilege should not exist without them. We do not think that these cases conflict with the conclusion which we have reached in this case.

We have examined the other authorities referred to, among which are *Mitford* v. *Mitford,* 9 Ves. Jr. 86; *Mitchell* v. *Winslow,* 2 Story, 630; and also the cases of *Gibson* v. *Warden,* 14 Wall. 244, and *Cook* v. *Tullis,* 18 id. 332; but these were all cases in which the creditor claiming adverse to the assignee had a clear legal or equitable title to the property claimed. None of them stood as the present case does, upon the claim of a privilege expressly denied by the law. We do not deem it necessary, therefore, to go into a review of those cases. They cannot affect this.

Whilst it is generally true that an assignee for the benefit of

creditors holds the property assigned subject to the same equities as the debtor or assignor held it, it is not universally true. Many transactions would be binding òn the latter which would not be binding on the assignee.    All sales and securities made for the actual purpose of defrauding creditors are of this class By the law of Louisiana, a pledge, in order to be effective against third persons, must be accompanied by a privilege.    It may be valid as a contract between the parties without this quality, as held both in the French law (as already shown) and in Louisiana, in the case of *Matthews* v. *Rutherford*, 7 La. Ann. 225.    But art. 3162 expressly declares that the privilege arising from a pledge does not subsist except when the thing pledged has been actually put and remained in the possession of the creditor, or of a third person agreed on by the parties. Without the privilege, or right of preference, the Credit Mobilier has no claim to hold the securities in question as against the other creditors.    How, then, can it set up such a claim against the receiver?    The receiver does not represent the bank alone: he represents all the parties.    He represents the law, which takes charge of the property for the benefit of all creditors, according to their respective and mutual rights.    Suppose no receiver had been appointed, and, when the bank failed, it had called the creditors together, and laid all its assets on a table, could the Credit Mobilier, in presence of the other creditors, have laid its hands on the securities in question, and claimed them by right of any privilege or preference?    It certainly could not have done so if it had no privilege as against them.    And yet this is precisely the relation in which the parties stood.    The existence of a receiver, as trustee for all, did not change it.    That one essential thing which the law requires for the subsistence of the privilege, namely, possession, was wanting.    Other formalities might have been dispensed with. But, possession is essential, — made so by the express terms of the law.    Nearly all the cases in France, where this question has arisen, have been contests between creditors claiming by way of pledge, and the syndics of the failing debtor, who stand in the place occupied by the receiver here.    If there is any distinction between them, it is in favor of a firmer right on the part of the receiver to protect the interests of the general cred-

itors. He is not made receiver by a voluntary assignment of the bank, but is appointed by the magistrate *in invitum* the bank, for the very purpose of securing equal justice to all its creditors, and under a law which sternly forbids preferences. Surely such an officer, whatever may be the rule in the case of voluntary assignments, may assert those rights of the general creditors, which the law itself creates, without being subject to all the disabilities under which the bank would labor in combating its private engagements with favored creditors. If the law says, " there shall be no privilege, as to third persons, by a pledge without possession," there will be no need of a judgment and execution in order to oppose such a pledge, if only a creditor, or one who represents creditors, has a proper standing in court. Insolvency of the debtor, if a bank, and the appointment of a receiver thereof, will force the pledgee into concurrence with the general creditors; and the receiver's power will be fully adequate to the protection of their interests as established by law. The case of *Bank of Alexandria* v. *Herbert* (8 Cranch, 36) presents a state of things almost precisely analogous to this. There, the trustee of an insolvent debtor recovered the proceeds of property which the latter had mortgaged to the bank. The recovery was had on the ground that the mortgage had not been recorded in proper time under the law of Virginia, which declared that all deeds and mortgages, though good between the parties, should be void as to creditors and subsequent purchasers without notice, unless recorded within eight months from date. " To set up this deed against the creditors," said Mr. Chief Justice Marshall, " would be to defeat the very object for which the law was made."

Indeed, it may be laid down as a general rule, as well at the common law as the civil law, that a trustee, assignee, or syndic, having the powers and occupying the relations which are sustained by a receiver under the National Banking Act, or an assignee in bankruptcy, may well oppose any privilege or preference which the law itself, unaided by a *bona fide* purchase or judgment, would regard as void against the general creditors in a direct contest between them and the parties claiming such privilege or preference; even though the debtor himself, on account of some personal disability arising from his own acts

or engagements, could not resist the claim. That an assignee in bankruptcy has this power cannot well be doubted; and since a national bank cannot be put into bankruptcy, but can only be wound up under the peculiar provisions of the banking act, the receiver appointed by virtue thereof must have the same power, or the absurd consequence would follow, that the property of a bank disposed of by voluntary conveyances, or pledges not good as to third persons, would be beyond the reach of creditors.

Where the legal or equitable property in a security passes, and there is no express law invalidating the transfer, the creditor will be entitled to hold it as well against the assignee or receiver as against the debtor; because the assignee only takes such title as the debtor has at the time of the assignment or insolvency. In that case, however, the question of fraud would be admissible as a question of fact, to invalidate the transaction. But, in the present case, that question does not arise; or, if it might be raised, it is immaterial. The Credit Mobilier claims a privilege by virtue of a pledge; and such a privilege, as we have seen, cannot be maintained as to third persons, without possession. Bad faith, it is true, would defeat the pledge though the creditor had possession. But want of possession is equally fatal, though the parties may have acted in good faith. Both are necessary to constitute a good pledge so as to raise a privilege against third persons. The requirement of possession is an inexorable rule of law, adopted to prevent fraud and deception; for, if the debtor remains in possession, the law presumes that those who deal with him do so on the faith of his being the unqualified owner of the goods.

This consideration meets the objection which is urged against the rule, that it would result in giving to the general creditors the benefit of the advances made to the debtor on the faith of the stipulated pledge, inasmuch as the estate is increased to the extent of these advances. It is true that the estate is so increased; but the debts and liabilities are also increased to the same amount by the demand of the party who makes the advances, — the only effect of the rule being, that the latter comes into concurrence with the other creditors on an equality, and not by way of preference; and if the latter derive any benefit from this result, it must be remembered that, in the view

of the law, they might not have given credit to the common debtor had he not remained in possession of the goods, and appeared to continue as the absolute owner thereof. If the pledge should be sustained, they would have good cause to complain that they had been deceived by the acts of the parties setting up the pledge. So that, on the question of relative merit and demerit, the parties are in all respects equal. It is on this principle that the law is founded.

These considerations also supply an answer to another suggestion, that equity will consider as done what the parties intended should be done, which it is assumed was, in this case, a transfer of the title of the securities. Equity will not exercise this power when it would injure third persons who have incurred detriment, and acquired consequent rights by the acts that are done. Such detriment has, in the view of the law, been incurred in this case, and such rights have, by the express letter of the law, accrued.

This suggestion may also be answered by the fact that it cannot be truly said to have been the intent of the parties to transfer the title. The agreement was only that "securities of the first class shall be deposited with the firm of Messrs. Cavaroc & Son." A transfer of the title would have been inconsistent with that unrestricted control over the securities which the bank desired to, and did, retain, and which must be considered as having been assented to by the Credit Mobilier, through the common agent, Cavaroc.

On this ground, therefore, of want of possession in the pledgee, or of a third person agreed upon by the parties, and of actual possession and control in the pledgor, we feel compelled to hold that the Credit Mobilier had no privilege as to third persons, and that the receiver was entitled to the securities in question.

The decree will, accordingly, be reversed, and the cause remanded to the Circuit Court with directions to enter a decree in favor of the complainant below in conformity to this opinion; and it is

*So ordered.*

MR. JUSTICE SWAYNE, MR. JUSTICE FIELD, and MR. JUSTICE HARLAN dissented.