Statement of the Case.
MONROE, J.
In June, 1904, a corporation was established, by act drawn in the parish of Ascension, for the declared purpose of canning syrup and molasses, buying and selling sugar, and establishing and operating plants. The capital stock was fixed at $50,000, divided into 450 shares of common, of $100 each, and 50 shares of preferred, stock, of like value. Of the original subscribers to the common stock, W. H. Stratton took 35 shares, L. N. Folse 35 shares, A. Daigle 20 shares, and .J. D. Clark 30 shares. Folse was made president of the company, Stratton vice president, and Clark secretary and treasurer. The capital derived from the original stock subscriptions was speedily exhausted and more was needed, and on October 12, 1904, there were issued to Clark, who paid nothing for them, four certificates, representing, in the aggregate, the 50 shares of preferred stock authorized by the charter, which certificates were •signed by Folse, as president, and Clark, as secretary and treasurer, and on the same day Clark, Folse, Stratton, and Daigle executed an instrument reading as follows:
“State of Louisiana, Parish of Iberville.
“Whereas the undersigned, J. D. Clark, W. II. Stratton, Jr., L. N. Folse, A. Daigle, having formed a corporation, under the laws of the state of Louisiana, known as the Stratton-Clark Company, Limited, and provided iii the charter thereof for the issuance of a limited number of shares of capital stock of said corporation, to be known as preferred stock, which stock is to be cumulative and to pay a guaranteed dividend of 10% ; and, whereas, it is to the interest of said corporation, and ourselves, as the holders of the common stock thereof, that tlie said preferred stock be subscribed, in order to furnish said corporation with sufficient capital to successfully conduct its business; and, vitoreas, J. D. Clark, a resident of the parish of Iberville, has been induced by us to subscribe to the said preferred stock of said corporation, to the amount of $5,000, at par.
“Now, therefore, as a consideration, in addition to said capital stock, for the subscription of said J. D. Clark, and as a further inducement to him to subscribe therefor we hereby hind and obligate ourselves, our heirs and administrators, in solido, firmly by these presents, guarantee unto the said J. D. Clark that the dividends provided in said charter on said preferred stock shall be promptly paid, ami, that, in case of liquidation of said corporation, by legal process or otherwise, in addition to said dividends, he shall receive par for the stock so subscribed by him. It being the intention of this instrument and the signatures thereto to warrant and guarantee said J. D. Clark against any loss, either in dividend or principal, invested in such stock.
“Dated and signed this 12th day of October, 1904,
“White Castle.
“[Signed] J. D. Clark.
“W. II. Stratton, Jr.
“L. N. Folse.
“A. Daigle.”
Two days later (October 14th), and after he had furnished plaintiff with a written statement of the financial condition of the signers of the document above recited, and of the company, Clark borrowed from plaintiff the sum of $5,000, which was credited to the account of Stratton-Clark Company, Limited, and was thereafter drawn out (with other amounts deposited by the company) and used by the company for the purpose of its business. For the loan so obtained, Clark (being the apparent owner of the stock) gave his individual pledge note, in the usual form, with an inventory, on the hack, of the securities pledged — being the stock certificates —“and, also, personal guaranty, signed and dated at White Castle, Oct. 12, 1904, by J. D. Clark, Stratton, Jr., L. N. Folse, and A. Daigle.” There was also delivered to the plaintiff an instrument purporting to convey the stock to plaintiff, and an irrevocable power of attorney authorizing its transfer (?n the books of the company.
The note given by Clark was dated October 14th, and was made payable 90 days after date, and at its maturity, the interest having been paid by the company,, another note, *921 dated January 11, 1905, of like tenor, also running for 90 days, was substituted in its place; in other words, the original, note was renewed with the same security. Shortly thereafter, Clark died, insolvent, and a little later still — before the maturity of the note last mentioned — his father spoke to the gentleman, who, as their counsel, now represents Folse and Daigle, of the paper held toy plaintiff, and he (the gentleman referred to) mentioned it to them, whereat they professed to be very much surprised, denied that any such paper existed, and asserted that, if there existed any such instrument purporting to be signed by them, it was a forgery. They, however, visited the bank, and, on being shown the document held by it, admitted that they had signed it, and it was only when, at a later period, they filed their answer in this suit, that the bank learned that they considered that there was anything out of the way in the matter. The note last given by Clark matured about April 11, 1905, and some letters of demand, written by the bank, elicited the reply that Folse and Daigle did not consider themselves in any way liable, and thereupon this suit was brought against them and Stratton on the instrument of guaranty. Stratton does not appear to have been served with process, and no judgment was rendered against him. Folse and Daigle filed an exception of no right and no cause of action, and, with reservation, answered, alleging, in substance, that their signatures to the instrument sued on were obtained by fraud and misrepresentation—
“that, somewhere in the latter part of October, 1904,’at night, in the sugar factory of * * * L. N. Folse * * *, said J. D. Clark presented to L. N. Folse the said paper, the top part of which was filled up, the balance being blank, and asked * * * Folse to sign the same * * *, telling * * * Folse that said paper contained and was a prospectus of the Stratton-Clark Company, Limited, and it was necessary that the world know who were the stockholders of said company, so as to give'said company more business; that the blank part of said paper had to be filled by the legal advisers of said company, as he, Clark, could not word it so as to fulfill the desired purpose; that, relying "entirely and solely on the truthfulness of the statements made by said Clark, and having no reason to suspect any ulterior object or motive, defendant signed at the bottom of the page, and that this was all done in a great hurry, at night, and at a time when defendant Folse was busily engaged in his said factory; that after said Clark had, through fraud and' misrepresentation, obtained the signature of defendant Folse to said paper, said Clark took the same to defendant A. Daigle, and, making the same representations to him as he had made to defendant Folse, induced said Daigle, by and through said false misrepresentations, to sign said paper. Defendants aver that both of said signatures were obtained by said Clark through fraud, and in total ignorance on the part of defendants, and they signed the same in error,. Defendants aver that they, or either of them, never at any time gave their consent, or directly or indirectly agreed, to become bound on said paper, and at no time did Clark ever ask them, or either- of them, to guarantee said stock, and, as a matter of fact, neither of your defendants was ever aware how Clark paid for his stock, and had not the least idea of its whereabouts. Respondents deny that they, or either of them, ever at any time, entered into a contract of suretyship for or with Clark; that, under the circumstances, defendants not have become sureties for said Clark, and said Clark, well knowing this, fraudulently filled up said paper as it now stands; that the alleged inducements, set out in said paper, as reasons why defendants should sign, are absolutely false and untrue, and this to the full knowledge of said Clark, who concocted the same in fraud and for the purpose of giving an air of reality to said paper • that it was only long after the death of said Clark that defendants discovered, by the merest accident, that such a paper was in existence, and it was only on its view and inspection that defendants were informed and made aware of the fraud that had been committed by said Clark; that the signatures of defendants were attached to this paper in error brought about by the fraud, misrepresentation, and deception of said Clark, and defendants again aver and allege that they never at any time-made or entered into any contract of any kind with said Clark as set out in said paper; that plaintiff is struck with full knowledge of all these facts, if it is the pledgee of said paper, which is especially denied; that it holds the same subject to all the equities existing between said Clark and your defendants, and is-bound by the fraud committed by said Clark, and can no more recover than if Clark himself were the plaintiff herein.”
There were several “character” witnesses called on behalf of defendants, who testified that defendants are sugar planters, in good standing, whom the witnesses would believe on oath or otherwise. From the same witn *923 esses, and, perhaps one or two others, it appears that Clark’s reputation was equally good. The defendant Folse is said to be honest, hut “very close.”
Notwithstanding the elaborate and reiter.ated charges of fraud which are made against the deceased, Clark, there is no suggestion, either in the pleadings or the evidence, that the money borrowed by him from plaintiff, credited to the account of StrattonClark Company, Limited, and drawn out by him, as secretary-treasurer, was used for .any other than the legitimate purposes of that company, in which defendants owned nearly twice as much stock as did Clark.
Notwithstanding the specific allegations of the answer that Clark obtained defendants’ signatures to the instrument sued on by representing that it was a “prospectus,” gotten up to let the world know who were the stockholders of the said company, etc., Folse fails to testify to any such representation. To the contrary, it appears from the testimony given by him that none such were made to him; and the testimony of Daigle, who signed at a different time and place, falls very far short .of sustaining the allegation referred to. The .allegation that Folse signed “in a great hurry,” at a time when he was “busily engaged,” is absolutely disproved by his own testimony, hi which he says that he was not in a hurry, and was not busy when the paper was presented to and signed by him. The allegation that, when the paper was presented to defendant, “the top part was filled up, the balance being blank,” is not proved, the testimony of the defendants, who, in the absence of Clark, had the field to themselves, satisfying us that the paper in question, when presented to and signed by them, was sufficiently complete (if there were any blanks in ■it at all) to convey substantially the idea that it now expresses. The allegation that “the alleged inducements set out in said jpaper, as reasons why defendants should sign, are absolutely false and untrue,” is met by the admissions of the defendants, whilst on the stand as witnesses in their own behalf, that, before signing the paper, they read at least that part of it in which these “alleged inducements” are set out.
Folse testified, in substance, as follows: That Clark spoke to him “once or twice about preferred stock; said they would have to get four or five parties to stand for the preferred stock”; but he denied that Clark ever asked him to stand for it. Being asked to state the circumstances under which he signed the instrument sued on, he answered (and his examination proceeds) as follows:
“I remember I signed it in November; it was at night, between 7 and 8 o’clock, and I read a part of it and, the balance was left blank, He asked me to sign this only as a formality for the company. I then signed it.”
He says that Clark did not tell him of the object of the paper; that it was signed at his sugar house, after he began grinding; that he began grinding his cane on October 18th; that he heard no more of the paper until after Clark’s death, when he was told that there was such a paper in the possession of the plaintiff; that up to that time he had had no recollection of having signed it; that he had no recollection of having signed the stock certificates, though he must have done it, and did not know that they were issued to Clark; that the statement in the guaranty, “whereas, J. D. Clark has been induced by us to subscribe to the said preferred stock of said corporation to the amount of $5,000,” is not true; that the signing of the guaranty made no impression on him, and he remembered it only when he was shown his signature after Clark’s death, up to which moment (after hearing of its existence) he considered it a forgery. On his cross-examination he says that, when he signed the certificates for the preferred stock, he knew they were issued to Clark; that, when the guaranty was presented to him for sig *925 nature, he read it. Being asked whether he read the whole of it,'he replied:
“Part of it was left blank; _there was no binding” (referring, as we understand, to the clause whereby the signers obligate themselves). '“We were not held responsible.”
He does not remember what portion of the document was already written. Then, he says it was written “down to about where the document reads, ‘Whereas, J. D. Clark.’ ” He says the signature at the top of the document is his; also that at the bottom. He ■does not remember whether Daigle signed before he did or not. Being asked, “Is it not .a fact that the only thing written on that paper was, ‘Whereas, the undersigned,’ and down here at the bottom of the page?” he answers, “I don’t know.” Being requested to tell the court what part was left blank, he saj^s, “I don’t remember, positively.” 1-Iis cross-examination then proceeds:
“Q. When you signed it, were not these three 'lines below written? A. I don’t know. They might have been written, but I don’t believe. Q. Was it not a fact that you were very busy and did not pay any attention, as you stated in your answer? A. I was in the office; I don’t remember that I was so very busy. Q. Was not your attention so called, in your factory, ■that you could not read this document? A. I read part of it. Q. How much of it? A. Down to, ‘Whereas, J. D. Clark, a resident of the parish of Iberville’; from the top down to there; I don’t recollect whether the bottom 'lines were written. I don’t remember.”
He does not remember whether Stratton and Clark had signed before he signed, or not. On his redirect examination, he reiterates that he did not know, until after the grinding had begun, that the preferred stock had been issued to Clark, and he says that he then learned it from Templet (a relative who held one share of .the common' stock).
Daigle testifies that Clark brought the document in question to him for signature, at his house, about midday, on or about November 15th—
“that he said that it was a mere formality; that he wanted the people to know who belonged to that company; and I did it. 1-Ie said Mr. Pugh would have to read it and sign it. I thought Mr. Pugli was a member of the company then, and I signed it.”
He says that the paper was not filled up when he signed it; that he began to read it; that he does not know how many lines; that “there was no binding, like he has now;” that he does not know how many lines were written at the bottom; that he looked at it “a little while”; that he does not know how much blank space was left at the bottom; that he does not remember looking at the date; that he did not think he was binding himself, and did not busy himself about the matter after he had signed.
The stock certificates signed by Folse and issued to Clark bear date October 12, 1904, as does the instrument of guaranty sued on.
Plaintiff produces a letter from Clark, of date October 13th, in which, he says, inter alia:
“Mr. L. N. Folse, of White Castle, owns the Texas plantation, and he has refused $70,000 for this place. Mr. Daigle, of Trahan & Daigle, is easily worth $125,000,”
—and plaintiff’s president testifies that he required that statement as to the financial status of the signers of the guaranty before he would consent to make the desired loan on the security of that instrument and the stock, and both he and the cashier testify that the loan was made and the securities received on October 14, 1904, in which testimony, they are corroborated by the books of the bank and by the dates of the transfer and power of attorney and of the guaranty, which were delivered with the certificates of stock. There is no evidence, and no suggestion as to any reason, why the bank should have been interested in the financial standing of the defendants on October 13, 1904, save in connection with the obligation which defendants had assumed in the instrument which was then offered to the bank as security for the loan which was then being ne *927 gotiated on behalf of the company in which they were stockholders. That the loan was .obtained for the company is evident from the fact that the proceeds were credited to the company and were used for its purposes. It is equally evident that Clark gave his own note in the matter because it was necessary to pledge stock, which, though issued for the benefit of the company, was issued in his name and could be pledged only by the apparent owner.
It may be here stated that in July 1905, the Stratton-Clark Company, Limited, was, at its own instance, placed in the hands of a receiver, and proved to be utterly insolvent.
There was judgment in the district court in favor of plaintiff, and defendants have appealed.
Opinion.
The instrument of conveyance which was delivered to plaintiff with the stock certificates reads, in part, as follows:
"Know all men by these presents that I, the undersigned” (J. D. Clark) “hereby sell, assign and transfer to Citizens’ Bank * * *, 50 shares * * *, as per following certificates * * *, and hereby, irrevocably, appoint and authorize Citizens’ Rank * * * to make the necessary transfer * * * on the books * * *, with power to appoint and authorize * * • * a substitute * * *."
From which, it is argued that Clark had parted with the title to the stock, and that the guaranty, which, it is said, was personal to him, thereby became inoperative. The transfer and power of attorney must, however, be construed with reference to the entire transaction (including the recitals on the face and back of the pledge note), and, viewed in that light, were the ordinary incidents of a pledge to secure a loan, such as is executed every day, and many times every day. Civ. Code, art. 3156, Act No. 180, p. 370, of 1004; Denis on Pledge, pp. 28, 29, 95, 396; Lallande v. Ingram, 19 La. Ann. 364; Casey v. Cavaroc, 96 U. S. 477, 24 L. Ed. 779; Baudry-Lacantinerie, Nantissement, pp. 44, 45; Troplong, Nantissement, § 30; Laurent, de Gage, et seq. •
We are, however, of opinion that the guaranty was not personal to Clark, but that it must be regarded as having been intended to be used for the purpose for which it was used, and that having served that purpose, i. e., of enabling Clark to obtain $5,000 from the plaintiff, for the use and benefit of the company in which he and the other guarantors were interested, the guarantors are liable for the money so obtained.
No other theory appears to us consistent with the facts presented by the record, or with any rules regulating human conduct with which we are acquainted.
The defendants have taken the trouble to prove that they are large planters of sugar, and that they stand well in the community in which they live, and, as to Folse, that he is "very close,” but honest, from which we are bound to assume that they are accustomed to making contracts of many different kinds, and, being financially responsible, do so with proper regard -for the consequences. When, therefore, they come into a court of justice, defending against a claim for money loaned upon their signatures and used for their benefit, -alleging that the signatures were obtained by the fraudulent misrepresentations of a business associate who is dead and unable to speak for himself, and the testimony given by them fails to support their allegations, propounds a'theory which is at variance at once with their own characters and with all human probabilities, and which shows that their memories are exceedingly defective and wholly unreliable, the court is bound to find the basis for its judgment in facts and probabilities otherwise established.
The Stratton-Clark Company, Limited, in which Folse, Daigle, and Stratton appear to have owned three times as much stock as did Clark, needed money with which to pay its debts and to carry on its business, and Folse, *929 who was the president, says that Clark spoke to him on several occasions about getting four or five of them to “stand for,” or guarantee, the preferred stock. On October 12, 1904, he signed, and issued to Clark, four certificates for the $5,000 of preferred stock, and yet 'he swears that he did not know until he was told by Templet, some time in December, that the preferred stock had been issued to Clark. The stock was issued without consideration, in violation of the prohibition of the Constitution, and the president of the company, who issued it, does not pretend to give any reason whatever for so doing. 1-Ie says simply (in effect), “I issued this stock, giving Clark an interest, exceeding, and taking precedence of, my own interest, in the company, and then forgot that I had done so.” We feel obliged, however, to seek elsewhere in the record for a reason for an act which was in fraudem legis, and which might otherwise appear to have been intended as the basis of an actual fraud, since Folse was bound to know that Clark could transfer the certificates so issued- to him, and that they appeared to represent $5,000 actually paid into the treasury of the company, whereas, in fact, they represented nothing. And the reason, as it appears to us, becomes apparent when we consider the execution, and the use made of, the instrument of guaranty, signed by Clark, Stratton, Folse, and Daigle, and bearing even date with the certificates of stock. Both Folse and Daigle admit that they read part of this instrument, including the following:
“Whereas, it is to the interest of said corporation, and ourselves, as holders of the common stock thereof, that the said preferred stock be subscribed for, in order to furnish said corporation with sufficient capital to successfully conduct its business.”
They knew, therefore, and they admit that' they knew, that they were signing an instrument, the preamble of which contains the statement that it was to the interest of the company, and to their interest, that the preferred stock should be disposed of. But they would have the court believe that they affixed their signatures without any further information as to its then or prospective contents, save as they were told by Clark, and that thereupon the matter passed so entirely from their memories that when, a few months later, they were told that there was such a paper in existence, they immediately declared it a forgery, and were enabled to recall the fact that they had signed it only when confronted with their signatures. Just below the point where defendants say they stopped reading, we find the following matter, which they do not pretend to deny was there at that time:
“Whereas, J. D. Clark, a resident of the parish of Iberville, has been induced by us to subscribe to the preferred stock of said corporation, to the amount of $5,000, at par.-”
Defendants testify that the recital that they induced Clark to subscribe for the stock is false, and, as that recital carries the inference that the company had been made $5,-000 richer than was really the case, it, no doubt, was false to that extent. But the defendants do not explain why they did not read, before signing, a false statement, or why, having read enough to apprise them of the fact that the instrument was intended for some purpose connected with the use of the preferred stock, “in order to furnish said corporation with sufficient capital,” etc., they did not read any further, but wrote their names (at least, Folse says that he did), first in the preamble, and then at -the end of the instrument.
We may say, in conclusion, that no attempt whatever has been made to show that there is anything peculiar in the appearance of the instrument in question; that any part is in different writing or different ink from the other ; that there is any crowding of words to get them into a space not large enough to accommodate them, • or extending of words to *931 fill a space tliat was too large, or that the signatures are suspiciously distant from the text; and, so far as we can judge from the copy in the record, there is no basis for any such criticism, the document, as copied, having the appearance of having been executed at one time, and as having been signed after it was completed in other respects.
In view of the conclusion which has been stated, we consider it unnecessary to enter upon the consideration of the legal propositions discussed by defendants’ counsel and predicated upon the theory that the guaranty was purely a personal matter between the defendants and Clark.
Judgment affirmed.