*1055 Dissenting Opinion.
Watkins, J.
With respect to the claim of the opponent, Mrs. Tassin, the question is whether the possession of DeJahan was such that her privilege had struck the collaterals that were attached to the note of Pierre Lanaux so effectually as to have consecrated their proceeds to its payment, had said collaterals been seized and sold by any other creditor of Lanaux.
The contention of Mrs. Tassin’s counsel is that, at the request of Pierre Lanaux, it was agreed between him and Mrs. Tassin that she should loan Lanaux the sum of forty thousand dollars out of her funds then in his hands, on his demand note, to be secured by a pledge of Louisiana State consols and New Orleans Insurance Association stock as collateral security. That it was further agreed between said parties that the pledge was to be arranged in the following manner, namely:
The note, together with the securities, were to be placed in the possession of George DeJahan, who was to place them in a bank box, which was to be placed on deposit by DeJahan in an iron safe of the New Orleans Insurance Association, at the time in the branch depository of the State National Bank, and in the custody and under the control of the secretary of the insurance association, who alone possessed the combination of the vault and safe.
That the secretary of the insurance association was instructed to deliver the box containing the securities to DeJahan on his demand, the latter having instructions from Pierre Lanaux to deliver the note and pledged securities to Mrs. Tassin on her demand.
That on the 3d of August, 1892, the note and act of pledge were executed, and they, together with the accompanying securities, were placed in the box and the box was placed in the safe of the insurance association, where it remained uninterruptedly until after Lanaux’ death.
That on the 7th of August, following the date of the selection of the securities, and in pursuance of the previous agreement of Mrs. Tassin and Pierre Lanaux, and by direction of Pierre Lanaux, De-Jahan visited Mrs. Tassin at her plantation in the parish of St. John, and explained to her all that he had done — describing the note which he had executed for Lanaux to her order, with the designated securities attached — and that Mrs. Tassin expressed herself satisfied *1056 that he had carried out the aforesaid agreement, and approved of what he had done.
That immediately after the death of Pierre Lanaux, Mrs. Tassin called on DeJahan, and, in person, demanded the note and securities; but he declined, because, in his opinion, the death of Lanaux had terminated his authority in the premises.
The facts bearing on the foregoing propositions are detailed substantially by two or three of the witnesses, and it may be fairly summarized as follows, viz.:
. Mrs. Tassin states that she had three separate and distinct interviews with Pierre Lanaux on the subject of her business, then in his hands, viz., on the 11th of June, 1892, on the 21st and again on the 25th of July, 1892.
In the first interview, she gave him instructions to invest for her, in State bonds, the balance of forty-five thousand nine hundred and seventeen dollars and twenty-six cents then remaining in his hands to her credit; in the second, she agreed to loan him forty thousand dollars on his demand note, secured by a pledge of State bonds of the par value of thirty-five thousand dollars, and in stocks of the New Orleans Insurance Association sufficient in amount to cover the balance of five thousand dollars; in the third, there was a repetition of the second, the details thereof being reiterated.
She states that Pierre Lanaux’ proposition was to place his demand note for forty thousand dollars, with the aforesaid securities attached, in the hands of George DeJahan, which he would instruct him to place in a bank box in the safe of the New Orleans Insurance Association, to which George Lanaux, secretary of the company, had exclusive access; and that, at the same time, he would instruct the secretary to hold the box subject to the order of DeJahan, who was to be authorized to deliver said note and securities on her demand.
That, in her last interview with Pierre Lanaux, the latter inquired of her to know if she perfectly understood all the instructions he had previously given her, and that she replied in the affirmative.
Mr. George DeJahan makes the following statement, viz.:
“ Mr. Pierre Lanaux gave me instructions before leaving — that is to say, a few days before, on the 2d of August, he told me to make a note for Mrs. Tassin; to place forty thousand dollars for Mrs. Tassin, or thirty-five thousand Lousiana State bonds, and to com *1057 píete the balance of the pledge with New Orleans Insurance Association slock.”
Again he states:
“ On the 3d of August Mr. Lanaux told me that he had given instructions to Mr. George Lanaux to call upon me for a certain box, in which I was to place the pledges for Mrs. Tassin and (others) * * * Mr. Pierre Lanaux called at the office (on) the 3d, at about 2 p. m. He asked me if I had executed his orders. I told him yes. I went to the bank and got the box. I brought it into the office, opened it in his presence, exhibiting to him the notes for all these different parties, made packages before him, and replaced them in the box.
“ That was on the 3d of August.”
Again he says:
“Mr. Lanaux’ instructions were to deliver to. the parties whose names were on these packages, at their request.”
He states that on the 4th of August, at about 11 or 12 o’clock m., he telephoned George Lanaux, secretary of the insurance association, that he was ready to deliver to him the box, and he came and met him, and that they went together and placed the box in his safe, in the vault of the insurance association.
He further states that he retained the key to the bank box, which continuously remained in the safe until after the death of Pierre Lanaux, and was then delivered to him by George Lanaux, and he opened it in his presence.
He was asked the question whether he would have delivered the packages to the parties named if they had demanded them; and his answer was that he would, as Mr. Lanaux had instructed him to deliver the packages to the parties named on the back of the different envelopes, upon their demand. He concludes his answer by making this statement:
“ His instructions were to put them in the box, as I stated yesterday, subject to their demand.”
This witness further states that he went to “Mrs. Tassin’s house on the 7th of August, 1892, * * and told (her) that Mr. Lanaux had placed — invested for her, forty thousand dollars on his note, secured by thirty-five thousand dollars of Louisiana fours, and five hundred and twenty shares of New Orleans Insurance Association, as he had promised her. Mr. Lanaux had told me to go there.
*1058 “ Q,. Did he instruct you to go there and inform, her ?
“A. Yes.
“ Q. After you related to her (Mrs. Tassin) what occurred on the 3d of August, did she say anything ?
“ A. Well, she said it was all right, according to what Mr. Lanaux had promised her."
This witness again states that after Mr. Lanaux’ death, Mrs. Tassin called on him for the note and securities, but he declined to deliver them, because, in his opinion, his authority from Pierre Lanaux ceased at his death.
Oounsel for the executor said, interrogatively, “ And, therefore, you knew that when he died you' would have no power over it, for the reason that it (the box) must be opened in his estate,
“But his answer was ‘no; I did not think it belonged, even after his death, to his estate.’ ”
“ Q. The instructions of Mr. Pierre Lanaux were up to the time of Ms death ?
“ A. He did not specify up to the time of his death. The words were: ‘ You will deliver these packages to the parties whose names are on them, on their demand.’ Those were the only words he spoke to me in reference to these packages.”
The witness then repeats, that the investments or pledges were thus made and placed, in a bank box, and the parties were duly notified of the fact of the pledges having been made; and that their accounts current were duly credited with the proper amounts, corresponding with the amount of the secured notes.
Mr. George Lanaux states that on the 2d or 3d of August, 1892, Pierre Lanaux “ crossed ever from the State National Bank to the office of the New Orleans Insurance Association, came to (his) office and said, ‘ George, can you put a bank box in the iron safe of your company?’ To which question the witness replied, ‘It depends on the size of the box. Our iron safe is pretty full.’ Lanaux said, ‘ Try and put the box in the safe; George DeJahan will give you the box-.’ That was all that P. Lanaux said to me in relation to the box. That was in the morning between 10 and 11 o’clock. About 2 o’clock that same day I telephoned to DeJahan * * * asking him if P. Lanaux told him about a bank box which I was to put in the safe of the New Orleans -Insurance Association. He said yes, but he was not ready to put the box in the safe, but would telephone *1059 me. * * * The following day DeJahan telephoned that he was ready to pnt the box in the safe of the company. I answered, to wait for me at Lanaux’ office, that I was coming immediately. I left my office and proceeded to Pierre Lanaux’ office on Oonti (street), and together, accompanied by DeJahan, took the bank box from the desk in P. Lanaux’ office and went to the Branch Depository State National Bank, corner of Royal and Conti streets, and having assistance of employés of the bank we went into the vault where our safe is. I opened the safe and after having moved certain securities from one shelf to another we succeeded in putting in the bank box. * * * There is no key to the safe. There is a combination. I had the combination. I was the only person who had the combination.”
On being asked if he knew anything of the contents of the box, said he did not.
He further states:
“ On the .6th of September I delivered the box to George DeJahan, who called for it. I had received it from George De-Jahan. * * * He returned it to me in the course of five minutes.”
This witness again says:
“ I surrendered the box to DeJahan, having received it from him. I did not know whose agent he was, or considered himself to be. That I can not answer. DeJahan will answer that. You can not expect me to answer for DeJahan.”
Mr. Denis Lanaux stated that “ the first time he saw this tin box was on the 6th of September * * * with DeJahan and George Lanaux. I had been informed by DeJahan that he had a box, which box was in the safe of the New Orleans Insurance Association, which was in the vault of the Branch Depository of the State National Bank,” informing witness of the contents.
He said that George Lanaux opened the vault and DeJahan opened the bank box. “We found packages — one marked ‘Property of Mrs. Tassin,”’ etc. He again said: “DeJahan told me he had the bank box.” and being asked “when he was so informed by DeJahan,” replied that “it was on the 4th or 5th of September, * * * two or three days before Lanaux died.”’
On this evidence there can be no doubt of the following facts being fully established, viz.:
*1060 1. That there was an agreement between Pierre Lanaux and Mrs. Tassin that certain specified collaterals were to be attached to his demand note for forty thousand dollars in her favor, as security therefor.
2. That the note was accordingly executed and the aforesaid col-laterals were thereto attached, and that same were placed in an envelope endorsed “Property of Mrs. F. E. Tassin,” and that this envelope was deposited in a bank box, that was locked, and deposited in a safe in the vault of the New Orleans Insurance Association.
3. That DeJahan was proposed by Pierre Lanaux as the person who was to carry the agreement between himself and Mrs. Tassin into effect, and that Mrs. Tassin was so informed, and unequivocally accepted the proposition.
4. That Pierre Lanaux gave DeJahan instructions in exact conformity with the aforesaid agreement; that in pursuance of said instructions DeJahan accepted the trust, and made and executed in favor of Mrs. Tassin a demand note for forty thousand dollars and signed per pro. Lanaux; and to that note attached the specified col-laterals, and placed them in a bank box, and locked the box and deposited it in the iron safe of the New Orleans Insurance Association —retaining the key in his possession.
5. That in pursuance of the instructions of Pierre Lanaux, DeJahan visited Mrs. Tassin at her plantation in the parish of St. John, for the express purpose of reporting to her, carefully and succinctly, all he had done, as Mr. Lanaux had promised her he would, and which she acknowledged to DeJahan had been done according to their agreement.
6. That DeJahan, assisted by George Lanaux, secretary of the insurance association, and other bank employés, placed the bank box containing the securities specified in the safe of the insurance association in the vault of the company — DeJahan retaining the key of the box and George Lanaux keeping the combination of the safe.
7. That the box thus remained on deposit and was not touched by any one until after the death of Lanaux, when George Lanaux opened the safe and permitted DeJahan to remove the bank box.
8. That on the 7th of September, 1892 — the next day after the death of Pierre Lanaux — Mrs. Tassin called upon DeJahan for the delivery to her of the note and the pledged securities, but her re? quest was declined on account of Pierre Lanaux’ death — DeJahan explaining that she would receive them in a few days.
*1061 9. That on the following day DeJahan, accompanied by Denis Lanaux, visited the Branch Depository of the State National Bank and called upon George Lanaux, secretary of the New Orleans Insurance Association, for the delivery of the bank box; that the secretary at once opened the vaults and safe of the insurance association and delivered the bank box to DeJahan, and that DeJahan produced the key, opened the box, and he and Denis Lanaux examined the packages therein deposited — whereupon the bank box with the pledged securities were returned to the custody of the insurance association.
Recurring to the query propounded, it appears that, in the light of the evidence detailed, it must receive an affirmative reply — that the possession of DeJahan was such that Mrs. Tassin’s privilege so effectually struck the collaterals that she would have been entitled to the proceeds if any other creditor of Lanaux had seized and sent them to sale.
Or in other words, Pierre Lanaux absolutely lost, or discontinued control over the pledged collaterals from the moment the bank box containing them had been, by DeJahan, deposited in the iron safe of the New Orleans Insurance Association. After that date the custody of DeJahan was exclusively for the account of Mrs. Tassin, to whom he was directed by Pierre Lanaux to deliver upon her demand. With Pierre Lanaux’ knowledge, and by his direction, the collaterals indicated by him and agreed upon by him and Mrs. Tassin were segregated from Ms other assets, were attached to his demand note in her favor, and placed in an envelope and marked, “Property of Mrs. E. E. Tassin,” and by DeJahan deposited in a bank box of which he possessed the key. With the assistance of the secretary of the insurance association and others of its employés, the bank box containing these pledged securities was removed from the desk of Pierre Lanaux and deposited in an iron safe in the vault of the insurance association, of which its secretary alone possessed the combination— thus completely severing Pierre Lanaux’ control and dominion over the box and its contents. And when DeJahan called on Mrs. Tassin and informed her of all that he had done, “as he (Pierre Lanaux) had promised her, ’ ’ and Mrs. Tassin expressed her approbation of the acts he had performed, “ as Mr. Lanaux had promised her,” the vinculum of the contract was completed by her acceptance; and henceforth DeJahan was exclusively her agent.
That DeJahan so understood his position is fully attested by his *1062 statements to the effect (1) that Mr. Lanaux’ instructions were for him to deliver the pledged collaterals to the parties whose names-were endorsed on the respective packages at their request; (2) that the instructions of Pierre Lanaux were not up to the time of his death, but that he was to deliver upon the demand of the pledgees; (3) that he (DeJahan) informed Mr. Denis Lanaux two or three days prior to the death of Pierre Lanaux that he held a box in the safe of the New Orleans Insurance Association, containing pledged securities; (4) that immediately after the death of Pierre Lanaux DeJahan visited the vault of the insurance association in company with Denis Lanaux, and the secretary of the insurance company opened the vault and the safe, and delivered the box containing the securities into the hands of DeJahan, and he unlocked it in the presence of the secretary and Denis Lanaux, and thereupon he and Denis Lanaux examined the securities that were found in the box, and, among the number, the package endorsed “Property of Mrs. P. E. Tassin;” (5) that after their examination was completed the packages were returned to their places. Mr. DeJahan locked the box and returned it to the custody of the secretary of the insurance association, and he in turn placed the box in the iron safe, closed it, as well as the vault, he alone possessing the combinations. What more could have been done, or what additional formality could have been observed, to have perfected the delivery of pledged collaterals, to a third person agreed upon by the parties.
The text of the law is, “ It is essential to the contract of pledge that the creditor be put in possession of the thing given him in pledge, etc.” R. C. C. 3152.
But there is an express qualification placed upon this article in these words, viz. :
“ In no case does this privilege (R. C. C. 3157) subsist on the pledge, except when the thing pledged, if it be a corporeal movable, or the evidence of a credit, if it be a note or other instrument under private signature, has been actually put and remained in the possession of the creditor, or of a third person agreed upon by the parties." R. C. C. 3162.
Was not DeJahan the third person agreed upon by the parties? Was not his selection duly notified to him? Did he not carry out his instructions to the letter in the preparation of the note and pledge and in giving to Mrs. Tassin information of his having performed all the .acts that Pierre Lanaux had promised her should be *1063 performed? Did not Mrs. Tassin specifically approve and accept same, and subsequently call on DeJahan for the note and pledged collaterals in keeping with Lanaux’ directions to deliver on his order? And, finally, did not DeJahan declare to Denis Lanaux, before Pierre Lanaux’ death, that he held possession of the pledged col-laterals; and, after Lanaux’ death did not the secretary of the insurance association deliver them to him? And can it be doubted, in view of the act of the secretary in surrendering the actual possession of well nigh $150,000 of State bonds into the power of DeJahan two or three days after the death of Pierre Lanaux, that DeJahan had a right of custody and control, entirely independent of Lanaux? There can be no other solution of the question.
What is the answer to the foregoing proposition? That of the District Judge was — as appears from his reasons for judgment — that the instructions of Lanaux to DeJahan ‘ ‘ were those of an employer to his clerk.” That Lanaux “said nothing about the bank box, or of DeJahan’s holding it, or the securities it contained, as the agent for any one, or as a party agreed upon with whom the box and securities were to be deposited; nor did he, at the' time, instruct DeJahan to notify the pledgees that the securities had been placed in the box subject to their demand; but DeJahan testifies that he did so, at some time not mentioned in the testimony.”
It is evident that the Judge a quo was under a misapprension of the facts adduce in evidence on all of the foregoing propositions. Pierre Lanaux being dead his lips are sealed and can not speak; but DeJahan’s testimony is clear and unmistakable. He says — using his own words: “ His instructions were to put it in the box, as I stated yesterday, subject to their demand.” Again: “ He did not specify up to the time of his death. His words were: ‘You will deliver these packages to the parties whose names are on them on their demand.’ ”
Again: “I went to Mrs. Tassin’s house on the 7th of August, 1892, * * * and told her that Mr. Lanaux had placed, invested for her forty thousand dollars on his note, secured by thirty-five thousand dollars of Louisiana fours and five hundred and twenty shares of New Orleans Insurance Association, as he had promised her. Mr. Lanaux had told me to go.
“ Q, Did he instruct you to go there and inform her ?
“A. Yes.
*1064 “ Q. After you related to her (Mrs. Tassin) what occurred on the Sd of August, did she say anything ?
“A. Well, she said that it was all right, according to what Mr. Lanaux had promised her.” '
From the foregoing, it is perfectly evident that DeJahan had been made acquainted with “ what Mr. Lanaux had promised her,” and that one of the things he had promised her was that DeJahan was to deliver the securities to her on her demand. It is equally evident that he did inform Mrs. Tassin that he had deposited Lanaux’ note and the securities he had specified in their previous agreement, which he would deliver on her demand; and that she expressed herself satisfied that he had done all that Lanaux had promised her. It is likewise evident that the dates, places and circumstances are all precisely detailed, with perfect accuracy.
That DeJahan was, at the time, the clerk of Pierre Lanaux, is a matter of no consequence.
The following queries have been propounded, the trend of which is to show that DeJahan acted in the capacity of Lanaux’ clerk throughout all of these transactions, and that, consequently, the bonds were at all times in Lanaux’ possession, being in his bank box.
The two must be taken together, as one is but the counterpart of the other.
“ (1) Can this court hold as a proper interpretation of the law of pledge—
“ That a debtor putting bonds in a package, marked with the debtor’s name, instructing his clerk to deliver, the creditor apprised in advance that instructions will be given, and notified afterward by the clerk — consummate the pledge, although the instructions were not fulfilled, and the bonds always remain in the debtor's box.
“ (2) Would any bank take such a pledge — i. e., lend money on the debtor’s bonds, in his bank box, and on his direction to his clerk to deliver; or would the bank have any pledge unless the clerk delivered? ”
Both of these questions may be answered in the negative without in any manner affecting the claim of Mrs. Tassin.
If it be conceded that DeJahan was acting as Lanaux’ clerk in the transaction with Mrs. Tassin, and that the collaterals remained in Lanaux’ custody all the while, of course there was no pledge. But DeJahan was the third person agreed upon between Pierre Lanaux *1065 and Mrs. Tassin to hold the collaterals for the latter. And, though the box may have been the property of Pierre Lanaux, it was removed from his possession before the collaterals were placed in it; and when the collaterals were deposited in the box DeJahan locked it, and thereafter retained the key. Then DeJahan, assisted by the secretary and his employés, put the box in the safe of the insurance association, to which the secretary alone possessed the combination No one had access to the box but DeJahan, and the secretary gave him access to it, after the death of Pierre fianaux — he being accompanied by George Lanaux. And, while it is true that DeJahan was the elerk of Pierre Lanaux within the scope of the latter’s business, he was, at the same time, the third person agreed upon by him and Mrs. Tassin toi hold the securities for the latter. There is no incompatibility between the two positions. This was distinctly held in Weems vs. Delta Moss Company, 33 An. 974, this court declaring that “ the objection that the two custodians of the property pledged were employés of the company has no force, and can not destroy the effect of delivery to Richard.”
Consequently, this is not the case supposed of collaterals being in a debtor’s bank box, who had given his elerk instructions to deliver, which instructions he had not fulfilled; but it proceeds on the theory that DeJahan was the third person agreed upon by the parties, and that he had possession, with instructions to deliver to Mrs. Tassin, on her demand — within the plain and evident meaning of the Code. (
But a further proof of Pierre Lanaux’ lack of possession and control of the collaterals is furnished by the procuration that was annexed thereto, authorizing the pledgee. — -not DeJahan — to séll the collaterals. Such a mandate to the pledgee is an adjunct of the pledge, and inseparable from it. Such a mandate is, in its nature, irrevocable. Journal du Palais, 12 and 19 of 1827. And in Renshaw vs. His Creditors, 40 An. 37, this court said: “The same principle applies in every case where the mandate is granted as a condition of the contract, or as a means of executing it.
“ In such case, the mandate, forming an element of a synallagmatic contract, is impressed with the qualities of such a contract, and is irrevocable. Journal du Palais, 7 July, 1837.”
And the court further observes:
“ It is plain that the powers of attorney here involved belong to *1066 the class which have been described, forming important adjuncts of the contracts of pledge themselves, and stipulated in the interest of the mandatories; that the mandator had no power to revoke them, and hence they are equally irrevocable,” etc. 40 An. 40, Renshaw vs. Creditors.
After its execution, Pierre Lanaux had no more power to revoke this mandate to the pledgee to sell than he had to revoke the note he had executed. When executed and delivered into the hands of the depositary agreed upon between himself and Mrs. Tassin, the mandate became irrevocable in so far as he was concerned.
The only question for consideration is, whether the agreement between pledgor and pledgee, and the possession of the third person agreed upon, was binding on Lanaux’ creditors, or, in other words, whether Mrs. Tassin’s privilege could be enforced on the proceeds of the securities pledged in case they had seized and sold them — as they evidently had the right to do. Auge vs. Variol, 31 An. 865.
If the pledge in favor of Mrs. Tassin was in keeping with the Code it was evidently binding on these creditors of Lanaux.
And as the Code authorizes that a contract of pledge may be effected by delivery of possession of the thing pledged to a third person agreed upon by the parties, the only question in this ease is, whether DeJahan had an effectual possession of the bonds. The only figure that the secretary of the insurance association cuts in the transaction is that, being the custodian of the company’s vault where the bank box was deposited, his custody proved the possession of DeJahan, and disproved the possession of Pierre Lanaux.
' If so, the Code declares that the privilege of the pledgee does subsist on the thing given in pledge, (1) when “ it has been actually put and remains in the possession of the creditor; ” (2) or when “it has been put and remains in the possession of a third person agreed upon between the parties.” R. C. O. 3162.
The latter character of pledge has been frequently and recently recognized and enforced by this court, on evidence far less clear and cogent than that which is afforded by this record.
In Conger, Exr., vs. City of New Orleans, 32 An. 1250, a case is presented of a demand for three twenty-year bonds of the city of New Orleans which the city had pledged — retaining the bonds in her own possession, she being the debtor; and this court said:
.“Possession, though essential to the validity of the pledge, need *1067 not be always in the creditor. It is sufficient that the thing pledged be in one occupying ad hoc the position of a trustee.
“The debtor himself may, in some cases, be considered as such trustee, and be given possession of the thing by him pledged, provided his tenure be precarious and clearly for the account of the creditor. The Louisiana doctrine is in perfect accord with both common, Roman and French laws. R. C. C. 3162; C. N. 2076,” and various cited authorities, particularly Pothier Pandects; Bell’s Commentaries on Scotch Law; Troplong Nant.; Dalloz Rep., and Duranton.
The authority of the Conger case has been followed and approved by this court in many subsequent and well considered cases.
In Weems vs. the Delta Moss Company, 33 An. 973, a case is stated of a pledge having been made of the building and factory of the company and its various movable effects, enumerated in the act of pledge, which was entered into between the president of the company and the creditor, appointing one of the company’s employés as custodian. And that pledge was maintained against the creditors of the company after it became insolvent — on the authority of the Conger ease.
In Jacquet vs. His Creditors, 38 An. 863, a ease is stated of a pledge-having been executed of certain machinery used for the manufacture of tobacco, consisting of boilers, engines, cutters, etc., which was. agreed to by the parties, who selected a third person as custodian— the act of pledge stipulating a right of sale in the pledgee. Same-was maintained against the creditors of the partnership after the-surrender of the pledgors, on the authority of the Conger and Jacquet eases.
In Woodward vs. the American Exposition Railway Company, 39 An. 566, a controversy is stated between the plaintiff, asserting a privilege resulting from a pledge of certain iron rails and other appurtenances used in the construction of a railroad, and which had been secured by an act of pledge of the railroad and all of its appurtenances by placing same in the custody of a third person named— the plaintiff’s privilege being resisted by an intervenor claiming a, privilege upon certain lumber he had sold the company for the purpose of building bridges, etc. The demand of the intervenor was-rejected, and that of the plaintiff was sustained — his privilege as pledgor of the railroad, in its entirety, being sustained as upon personal property, on the authority of the Conger, Weems and Jacquet cases.
*1068 In Levy vs. Ford, 41 An. 873, a case is stated of a pledge of mortgage note for seven thousand dollars for the security of two different claims of two different creditors — a third person holding possession as the mutual mandatory of the pledgor, and the two pledgees, they each having a limited interest in the pledged collateral. This pledge was maintained as against a competing mortgage creditor of the pledgor.
Peters vs. Pacific Guano Company, 42 An. 690, presents the case of the agents of a company engaged in the manufacture of guano, .giving in pledge to two lendors of money in Boston, on a cargo of guano, a bill of lading for the goods in transit to the consignee thereof afc New Orleans — one of the pledgees holding for the two. This court not only maintained the pledge with respect to the people in Boston, but held also that it extended to the consignees of the agents in New Orleans, as well as to the New Orleans bank, to whom he assigned it for another and independent loan — all without the specific knowledge of the guano company, the agent’s authority being purely derivative.
On the authority of the foregoing well-considered cases, interpreting the provision of the Code, which declares that a privilege subsists on the thing given in pledge, if it has been put and remained in the hands of a third person agreed upon” (R. C. C. 3162), the jurisprudence of this court may be considered thoroughly settled as to the question that is controverted in this case, not only with regard to the parties inter se, but with regard to creditors, privileged as well as ordinary, even in insolvencies and successions.
As opposed to the foregoing decisions the opposing creditors cite and rely on Casey vs. Cavaroc, 96 U. S. 467, which is a Louisiana case, and is predicated on Louisiana decisions and precepts of the -civil law, as stating a different rule.
In that decision a case is stated of a New Orleans bank offering to make a pledge of collaterals as security to the Soeieté de Credit Mobilier, of Paris, France, for proposed acceptances; the bonds and motes to be placed on deposit with a third person named and agreed upon between the bank and the society, said third person becoming .guarantor of the bank.
The question raised in that case was, whether “ there was such a delivery and retention of possession of the collateral securities as to constitute a valid pledge by the law of Louisiana?” And making ¡answer to that query the court said:
*1069 “ Olearly they were never out of the possession of the officers of the bank, and were never out of the bank for a single moment, bat were always subject to its disposal, in any manner whatever, whether by collection, renewal, substitution or exchange, and collections, when made, were for the account of the bank.”
In support of their opinion the court refers to only two decisions of this court as bearing on the question at issue, and those decisions, were rendered in Geddes vs. Bennett, 6 An. 516, and Succession of DeMeza, 26 An. 35. In those cases pledges were not sustained.
In the former a case is stated of certain barrels of whiskey being the object of a pledge, the creditor permitting the pledgor to remove them to his own premises, on his simple receipt, he subsequently making sale of them to another. In a suit of the pledgeeagainst the purchaser the sale was maintained.
That ease has not the least applicability, in my conception, to the* Oavaroc case, nor to the instant one, for the reason that it was not; the case of a thing being given in pledge, by placing it in the hands, of a third person agreed on.
In the latter case certain creditors of the deceased having made-advances, on the faith of an insurance policy, which he had left in the hands of his book-keeper, with instructions to deliver, the righfe, of pledge was denied, on the ground that the creditors did not have the possession requisite to constitute a piedge — this court holding- “ that the policy was never beyond the control of DeMeza, and that. Myers & Levy (creditors) never had the requisite possession thereof. The book-keeper never held the policy as agent or trustee for Myers & Levy. Although informed of his employer’s intention in regard 4o-one of the policies, be was never entrusted to deliver to Myers & Levy or any one else. There was, therefore, no delivery of the policy to Myers & Levy, although the deceased intended to do so. Consequently they never held it as a pledge, as collateral security,, for their accommodation endorsements.” (Our italics.)
It is evident, upon simple perusal of that paragraph of the opinion, that it was a case of alleged possession by the creditor of thecollaterals, and not that of a third person agreed upon by the creditor and debtor.
The two cases are exactly parallel, and, in my opinion, not in line-with the Oavaroc case.
In that case the court made an extensive examination and colla- *1070 tion of cases, and in its summary gives a very clear and comprehensive definition of the character of possession that is necessary to ■complete a pledge in the hands of a third person agreed on.
“ The difference, say the court, “ ordinarily recognized between a mortgage ” — i. e., at common law — “ and a pl.edge is, that title is transferred by the former, and possession by the latter. Indeed, possession may be considered as of the essence of a pledge (Pothier Nantissement) ; and if possession be once given up, the pledge, as such, is extinguished. The possession need not be actual. It may be constructive, as when the keys of a warehouse containing the goods pledged are delivered, or a bill of lading is assigned.
“In such case, the act done will be considered as a token standing for the actual delivery of the goods. It places the property under the power and control of the creditor.
“In some cases, such constructive delivery can not be effected, without doing what amounts to a transfer of the property also.
“ In such case, there is a union of two distinct forms of security— the pledge and mortgage; mortgage by virtue of the title, and a pledge by virtue of the possession.
“ This advantage exists when notes and bills are transferred to a creditor by way of collateral security. The possession gives them the character of a pledge. The endorsement, if payable to order, and their delivery, if payable to bearer, gives him the title also ;■ which is something more than a pledge.
“This double title existed in White vs. Platt, 5 Denio (N. Y.) 269, and Clarke vs. Islin, 21 Wall. 360. Hence the actual possession of the securities by the creditor was a matter of less importance in those cases.”
So in the instant case, the collaterals being of the class of commercial paper that are payable to bearer, and which, consequently, pass a complete title by mere delivery, DeJahan had title, as well as possession — his possession being evidenced by his possession of the key to the box in which the securities were kept, and to which no •one else had access, and upon which the opponents acquired no right during Pierre Lanaux’ lifetime.
But even if it be considered doubtful whether DeJahan held possession independently of Lanaux for the account of Mrs.Tassin, the court, in the Cavaroc case, cited various cases in which precedents are given of privileges having been recognized, as against creditors, *1071 even when the pledgor retained precarious possession of the thing pledged — as intimated in the Conger case.
A case in point is that of Clarke vs. Islin, 21 Wall. 360, in which the court held that the pledge was not vitiated by the pledgee returning the collaterals pledged to the pledgor for collection.
Also the case of White vs. Platt, 5 Denio. (N. Y.) 269, to same effect — the court holding that in such case the pledgor acts as the servant or agent of the pledgee, and the character of the security was not changed.
A strong case of the kind is cited from the. Massachusetts court— Macomber vs. Parker, 14 Pickering, 497 — of a pledge having been maintained through the precarious possession of the pledgor.
The pledgor was the proprietor of a brickyard, and the pledgee advanced the money requisite for the manufacture of bricks — the contract being that the bricks, as fast as made, should be pledged as security for the advances thus made; but the pledgor was to retain the bricks in his charge and sell them at retail and deposit the proceeds in bank to the credit of the pledgees.
Before sale the bricks in the yard of the pledgor were attached for a debt, but the pledge was maintained, the court employing this language, viz.:
££ To say that the limited authority to sell the brick by retail, in small sums, on account of the plaintiff, was a waiver of their posession of the residue that remained in the kilns in their yard, would be clearly against the intent and meaning of the parties; unreasonable and unwarranted by the evidence.
££ The special authority given by the plaintiff to the (brickmaker) was to clothe him with the character of an agent, to a limited extent only, and no remission to him, in his character of pledgor, of the plaintiff’s right to retain the bricks according to agreement.”
The creditor’s attachment was dissolved and the pledge maintained.
An example of this kind is furnished by Troplong, in treating of Art. 2076 of the Oode Napoleon — of which Art. 3162 of our Code is but a repetition — of a merchant in Beaune having pledged sixty thousand bottles of Burgundy wine to a merchant of Baden as security for a debt — the wine having been delivered to an agent of the pledgee, it having been agreed that the pledgor should give it necessary attention and care.
*1072 It so happened that the agent of the pledgee occasionally left the key of the vault in the possession of the pledgor, and on one occasion the latter removed some of the bottles of wine to his own premises, and subsequently to his surrender in insolvency the syndic insisted that the pledge was null and void on that account — the debtor and pledgor not having been dispossessed of the wine. But the validity of the pledge was maintained as against the creditors of the pledgor, in insolvency. Troplong, Nantissement, No. 311.
A like interpretation is given of the Code Napoleon by other French commentators. Dalloz Repertoire, Vol. 32, p. 455; Duranton, Vol. 18, Nos. 525 et seq.
The court in the Cavoroc case, citing two leading State decisions, express the further opinion on this question and say:
“So when the debtor is employed in the creditor’s service, his temporary use of the pledged article in the creditor’s business does not effect a restoration of the possession of the debtor. This is in accordance with the common and the civil law. Reeves vs Copper, 5 Bingham (N. C.), 136, was a ease of this kind. A sea' captain pledged his chronometer for a debt. He was afterward employed by the pledgee as master of one of his ships, and the chronometer was placed in his charge to be used on the voyage. It was held that the pledge was not lost. He recovered the chronometer as against a person to whom the master had pledged it a second time.
“In Hayes vs. Riddle (1 Sandiford, N. Y. 248) the plaintiff delivered to the defendant, at his request, a convertible bond of the New York &JErie Railroad Company (which had been pledged by the latter to the former) in order to get it exchanged for stock of the same company, which was returned and substituted for the bond in pledge. The defendant never returned, either the bond or the stock.
‘ ‘ The plaintiff brought action in trover against him for the bond, and recovered its value, being less than the debt for which it was pledged.”
Judge Story is in perfect accord with the views entertained by th.e Supreme Court, and in the course of an elaborate discussion of the question says:
“A possession is necessary to complete the title by pledge, so, by the oommon'law, the positive loss, or delivering back of the possession of the thing, with the consent■ of the pledgor, terminates his title. However, if the thing is delivered back to the owner for a temporary *1073 purpose only, and it is agreed to be redelivered by Mm, the pledgee may recover it against the owner, if he refuses to restore it after the purpose is fulfilled. So, if it be delivered back to the owner in a new character, as for example, as a special bailee or agent. In such a case the pledgee will still be entitled to the pledge, not only as against the owner, but also as against third persons; for, under such circumstances, the possession is perfectly consistent with the existence of the original right of the pledgee.” Story on Bailments, Sec. 299, citing various authorities.
In consideration of the authorities I have cited I think it can be safely affirmed that the pledge in favor of Mrs. Tassin was good and valid: (1) because the bonds were held by a third person agreed upon, with instructions to deliver on demand of the pledgee; (2) because they were deposited in a vault over which the debtor had no control, and in a bank box of which the third person agreed upon had the key; (3) because the pledgor had executed a power of attorney authorizing the pledgee to sell the thing pledged; (4) because the debtor had credited his books with the amount of the pledged col-laterals and also the creditor’s account; (5) because the third person claimed possession just before the pledgor’s death, and was allowed to have access to the pledged collaterals after Ms death — the safe and vault being voluntarily opened by the secretary of the insurance association, and the box containing the securities being unlocked by the third party in the presence of others and the secretary.
And, finally, if it be considered that the bonds were, after their deposit, in any manner in the possession or under the control of Pierre Lanaux, through De Jahan, it was only a precarious possession for the account of Mrs. Tassin, and which cannot be successfully opposed by the creditors of Lanaux as against Mrs. Tassin.
As the case as presented herein justifies and establishes the sufficiency and completeness of Mrs. Tassin’s pledge, our original opinion should to that extent be maintained; but as the proof fails, in my opinion, to show that the Hymels participated in the agreement selecting De Jahan as a third person to take and hold the collaterals specified, the contract of pledge as to them is lacking a vital element to give it force and efficacy as to third persons and creditors of Pierre Lanaux — though it was perfectly good and valid as between the parties.
The Code requires that there must be an actual delivery to the *1074 creditor or pledgee of the thing pledged. This is an essential to the completion of the pledge. It is the test of its efficacy.
But the Code states, as an exception to this general rule, that if the thing be placed and remain in the hands of a third person who is agreed upon by the parties, the privilege of the pledgee attaches to the thing pledged.
Having failed to participate in the agreement selecting DeJahan as custodian of the assets placed for the several accounts of the Hymels, their pledges were incomplete and they acquired no lien or privilege on said assets, and in this respect the opposition of creditors must be maintained, and to that extent our former opinion and de - cree should be amended, and as thus amended affirmed.
Mr. Justice McEnbrv concurs in this opinion with respect to the claim of Mrs. Tassin, but dissents from the views expressed as to other parties — maintaining the correctness of the original opinion of the court in its entirety.